(Decided 17th March, 1887.)

---

## JOHN T. ENSOR *vs* JOSEPH A. BOLGIANO.

*Instruction—Insufficiency of Evidence to Sustain action.*

Where from the testimony in the case, a verdict in favor of the plaintiff could be based only upon vague suspicion or irrational conjecture, it is the duty of the Court to instruct the jury that there is no evidence legally sufficient to sustain the action.

A. was injured on the B. and Y. Turnpike Road, and E. became his counsel to sue the company for damages. The agreement between them was, that E. should receive for his services one-half of what might be recovered. The suit was brought, the damages claimed in the *narr.* being $10,000. Afterward A. compromised with the company upon receiving $500, and executed to them a release, which was filed, and E. thereupon entered the case " off." Subsequently E. sued B., a stockholder of the company who had been instrumental in bringing about the compromise, to recover damages on the ground that B. with knowledge of the contract between E. and A. for a contingent fee in the suit against the Turnpike Company, and with malice towards E., induced A. to compromise that case, and break his contract with E. HELD :

That there was no evidence in the case legally sufficient to sustain the action, and the Court below was right in thus ruling.

Ensor *vs.* Bolgiano.

APPEAL from the Court of Common Pleas.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. · J., YELLOTT, STONE, MILLER, ROBINSON, IRVING, and BRYAN, J.

*William S. Bryan, Jr.,* and *William A. Hammond,* for the appellant.

The special exception called attention to the very obvious objection to the prayer, that it was too general, for it means nothing more than "that upon the pleadings and evidence the plaintiff was not entitled to recover." This in itself should have caused its rejection. 2 *Poe on Practice, sec.* 297.

The testimony relied on as being legally sufficient to sustain the third and fourth counts in the *narr.*, is as follows : Allen swore that Bolgiano sent him word that he wished to see him at Dr. Rankin's office. When Allen went there, Bolgiano said he wanted to see him about compromising his suit, and added that he thought he could get him $500, and have his doctor's bill paid. Bolgiano then added that by the time your lawyers get through with it-you will have only a small sum left, as the company would take an appeal. Bolgiano then said that a particular friend of Ensor's had told him (Ensor,) that Allen was a worthless, onery kind of a drunken fellow. Allen states that from this statement he came to the conclusion that Ensor would not attend to his case, and he determined to settle ; that he believed that whoever told.Ensor about his being a worthless, onery kind of a drunken fellow, did it to keep Ensor from attending to his case. He made up his mind from what Bolgiano told him in Dr. Rankin's office, to settle the case.

Bolgiano must have known that Ensor had a contingent fee, because when Allen said to him " suppose anything

comes between me and my lawyer about settling it; how about that?" Bolgiano replied "that's all right," and then added "he did not like to see a lawyer make anything off of a poor man," and advised him when he got the money "not to throw it away," to "put it to a good purpose.". It would be idle to contend that this was not evidence *legally sufficient* to justify the jury in finding that Bolgiano persuaded Allen to compromise his case in fraud of Ensor's rights, and that he further persuaded Allen not to pay Ensor, which advice Allen, of course, very promptly followed. As further evidence of Bolgiano's desire to deceive Allen into the belief that Ensor had received a bad opinion of him, and consequently would neglect the case, Bolgiano was silent when Allen asked if Charles Hammond was the man. If, after, by his silence and actions, Bolgiano had made Allen believe that Hammond had slandered him to Ensor, we could show that the whole thing was a falsehood; that neither Hammond nor any one else had told Ensor that Allen was "onery" or "worthless and drunken," it was very material for us to shew it, as proving malice on Bolgiano's part, and consequently it was error in the learned Judge to reject our offer to prove these facts.

It is submitted that the facts that the attorneys for the York Road Company are defending this suit for Bolgiano, and that he expects the company "to be liberal enough" to repay him the money he paid Mr. Wooten, confirms the view that Mr. Bolgiano in effecting this compromise was acting as the authorized agent of Mr. Taggart and the company. Bolgiano, himself, says he saw the release before it was signed.

Now, is an attorney without remedy in a case like this? Every time he, either from humanity, or, if you will, a more selfish motive, agrees to prosecute a case for a man too poor to pay a retainer, shall it be lawful for any dishonorable man for his own purposes to persuade the

ignorant and irresponsible client to defraud him? The leading case of *Lumley vs. Gye*, 2 *Ellis & Bl.*, 216, decides the broad proposition that an action lies for maliciously persuading any one to break his contract.

Wherever any one *maliciously* does any act to the damage of another, an action on the case will lie. *Comyn's Digest, Action on the Case for Misfeasance,* (*A.* 6,) where many examples are collected, *e. g.*—where a man threatened the tenant of another, whereby they departed from their tenures, 1 *Rol.*, 108, *l.* 2—where a man threatened those that came to one's stone pit, whereby he loses the profit of it. 2 *Cro.*, 567; 2 *Rol.*, 162.

In *Winsmore vs. Greenbank, Willes,* 577, it was determined that an action would lie for unlawfully and unjustly persuading, procuring and enticing the plaintiff's wife to continue absent, whereby the plaintiff lost the comfort and society of his said wife.

Now, unless the attorney is beyond the pale of the law, and not entitled to the same protection as the general public, or unless there is some peculiar vice in a contract for a contingent fee, these authorities show, it is submitted, that when Bolgiano persuaded Allen to settle the case himself, and added " that he hated to see a lawyer make anything out of a poor man," and Allen acting on this suggestion, defrauded Ensor out of his compensation, and kept all the money for himself, Bolgiano rendered himself liable to an action.

Even if Ensor had no right he could enforce, under the contract, for a contingent fee, the example given in *Comyn's Digest*, of the man who kept customers from his neighbor's stone pit, (*ubi supra*,) shows that any unwarrantable interference with a man's business, whereby he suffers pecuniary loss, is actionable.

It is, however, now too late to contend that a contract for a contingent fee is illegal, and that consequently no right can grow out of it. *Wylie vs. Coxe*, 15 *Howard,*

Ensor *vs.* Bolgiano.

415; *Stanton vs. Embry*, 93 *U. S.*, 556; *Howard vs. Carpenter*, 22 *Md.*, 26; *Cain vs. Warford*, 33 *Md.*, 36.

But whilst a man has the right (or to be more accurate, the power,) to settle or discontinue any case he may have pending in Court, it does not by any means follow that in exercising this power he may, with impunity, break such contracts as he may have made—*not* to settle the case save through his attorney, or with his consent. Any person has a *right* to break any contract that he may have made, but as the price of exercising this right, he must respond in damages to the party injured by such breach of contract.

The wrong done by Bolgiano consisted first, in persuading Allen to break his contract with Ensor; second, in persuading him not to pay Ensor anything at all for the work actually done. As, under any circumstances, Mr. Ensor was entitled, on a *quantum meruit*, to compensation for the work actually done, it is, we submit, impossible to decide that Mr. Bolgiano was not guilty of a tort when he persuaded Allen not to pay Ensor anything, unless this Court is prepared to overrule *Lumley vs. Gye*, and *Winsmore vs. Greenbank*, and the cases cited in *Comyn's Digest*, and to take the position that, by the law of Maryland, a man can with impunity persuade another to cheat his neighbors.

*Frank Gosnell*, and *Arthur W. Machen*, for the appellee.

This action—in its amended form—is a novel attempt to construct a legal injury to the *attorney* of a plaintiff out of the fact that a third person has advised or persuaded the plaintiff to terminate the suit, and make a settlement of the matter of controversy. Such an action is not only entirely unprecedented, but to allow it would be contrary to the policy of the law, and would pervert the office of attorney, intended as an aid to parties engaged in litigation, into an engine of litigiousness, and a means for the

perpetuation of strife against the will of the parties themselves.

One limitation the Judges who decided *Lumley vs. Gye,* have themselves placed upon the doctrine, that where A and B have made a contract with one another, it is an actionable tort on the part of C, maliciously to persuade one of them to break it. · The procurement of the breach of contract which is complained of, must have been *maliciously* done. 2 *El. & Bl.,* 216; *Cattle vs. Stocktown Waterworks, L. R.,* 10 *Q. B.,* 458.

Now it is evidently impossible that the present defendant could have had a malicious intention to procure the breach of a contract which he had *no knowledge of.* The demurrer to the plea admitted the fact of this want of knowledge. And the absence of all knowledge of such contract is equally manifest upon the evidence.

But there is a broader ground for the defence in this case. Whatever may be the scope of the doctrine of *Lumley vs. Gye*—upon the supposition that that doctrine will be adopted in this State—it would be contrary to law and public policy to allow it to be applied to the engagement existing between attorney and client—in favor of the *attorney.* It cannot be a legal wrong committed against an attorney, to recommend his client to stop the litigation. On this ground the learned Judge of the Court of Common Pleas rested his decision, and the soundness and propriety of it cannot, we submit, be successfully impugned. The client is *dominus litis,* and the rights of the attorney, as respects the prosecution of the suit, are subordinate to his. It would savor of maintenance to permit the client to make a valid contract with his attorney to prosecute the suit at all events, or until the sanction of the attorney is obtained. The client being thus under no legal obligation to carry on the suit, to induce him to discontinue it, is not to procure the violation of any contract. The client's own duty towards his attorney, when the case has terminated in one

way or another, is a matter between themselves, with which we have in this case nothing to do. 2 *Poe on Plead. & Pract.*, secs. 11 *and* 50; *In re Paschal*, 10 *Wall.*, 496.

MILLER, J., delivered the opinion of the Court.

Thomas F. Allen was injured on the Baltimore and Yorktown Turnpike Road, and Mr. Ensor became his counsel to sue the company for damages. The agreement between them was that Mr. Ensor should receive for his services one-half of what might be recovered. The suit was brought in August, 1883, the damages claimed in the *narr.* being $10,000. Afterwards in January, 1884, Allen compromised with the company upon receiving $500, and executed to them a release. This release was filed in July, 1884, and Mr. Ensor as counsel for the plaintiff thereupon entered the case "off."

After this, in October, 1884, Mr. Ensor brought the present suit against Mr. Bolgiano, a stockholder of the company who had been instrumental in bringing about this compromise. The original declaration contained two counts *in slander*, charging in substance that Bolgiano said to Allen these words in reference to the damage suit and the compromise of it: "From what I have heard of Ensor he will not attend to your case and will neglect it; that if he does attend to it he will charge you so outrageously for everything he does, that you will get but a very small sum out of your claim for damages, and you had better settle with the company; there is no use in your paying Ensor anything, and I do not want him to get one cent." Afterwards the declaration was amended by adding a third and fourth count which charge in substance that the defendant *well knowing the contract* which the plaintiff had made with Allen for compensation in the damage suit, and *wrongfully and maliciously* intending to injure him and deprive him of his fee as attorney in that action by means of certain *false and fraudulent* statements, arguments and

persuasions, made Allen believe the plaintiff would not attend to his case, and if he did, would so overcharge him that he would have but a small sum left, and *thereby induced Allen to break his contract with the plaintiff*, and to settle the suit without his knowledge or consent, for a small and grossly inadequate sum of which the plaintiff was to receive, and did receive, no portion whatever.   The particular statements made by the defendant to Allen as set out in the third count are these: "If you win your case the company will appeal and by the time your lawyers, *(meaning the plaintiff,)* are through with it, you will have but a small sum left; I don't like to see a lawyer make anything out of a poor man ; a special friend of your lawyers, *(meaning the plaintiff,)* has told him that you are an onery drunken fellow; and when Allen asked in case he should   settle, what abont his lawyer, the defendant answered, 'that is all right'" These counts also charge that the defendant committed these grievances, well knowing that Allen had no property out of which the plaintiff could recover compensation for this breach of contract or for his services

Besides *non cul.* the defendant interposed three special pleas, denying *first,* that he had any knowledge of the contract between Ensor and Allen at the time of the alleged conversations with Allen set out in the third count; *second,* denying that he wrongfully persuaded or induced Allen to break this contract, and *third,* averring that he did not, wrongfully or maliciously intend to injure the plaintiff and deprive him of his fee, by means of any false and fraudulent statements and persuasions, induce Allen to break his contract as alleged in the fourth count.   The case was tried upon issues joined on these pleas.

At the trial the testimony *was all on the part of the plaintiff,* no witness being examined for the defendant. Upon this the Court instructed the jury that the plaintiff has offered no evidence of the utterance by the defend-

·ant of the actionable words alleged in the declaration, and
having produced no evidence to sustain the material alle-
gations of the declaration, their verdict must be for the
defendant. This instruction is equivalent to sustaining a
general demurrer to the evidence, and raises the question,
whether there is any testimony *legally sufficient* to sustain
any count either of the original or amended declaration.
It has not been pretended that there was any evidence
whatever to sustain the counts in slander, and the sole
question is, was there any evidence legally sufficient to
sustain the third and fourth counts. The gist of these
counts is that ·Bolgiano, with knowledge of the contract.
between Ensor and Allen for a contingent fee in the
damage suit, and with *malice* towards Ensor, induced
Allen to compromise that case, and break his contract with
Ensor. Now what is the proof to sustain this charge?
The first witness was Allen. By putting him on the
stand the plaintiff vouched his credibility, but from the
start his counsel cross-examined him as if he were un-
worthy of credit. He testified that when he made the
compromise he did not know that the suit in the damage
case had been entered; that he had never heard a word
from Ensor on the subject, and to this he adhered to
throughont his examination. He says that Bolgiano sent
him word that he wanted to see him about compromising
the case. That when he saw him "He asked me what I
wanted, and I told him $1000; he said he did not think
he could get that, but thought he could get $500, and
would try to get my doctor's bill paid, and so T told him
'all right;' he talked a little longer and said if you
gain the suit, no doubt the company will·take an ap-
peal, and by the time your lawyers, (he didn't mention
any name at all) got through I might have but a very small
sum coming to me, no doubt; he then mentioned that he
*had heard* a particular friend of Mr. Ensor ·had told En-
sor I was a worthless onery kind of drunken man, I

asked him who it was, and he would not say, so I pitched on Charles Hammond out there, the only gentleman I knew who is a particular friend of Mr. Ensor; so then I came to the conclusion that I would settle the case *not having heard from Mr. Ensor."*

The witness reiterated again and again in his long examination the statement that the fact that he had not heard from Mr. Ensor, was *one of the reasons* which induced him to make the compromise. With the same pertinacity he also said that when Mr. Bolgiano spoke of his lawyers he *did not mention Mr. Ensor's name,* and that he neither *told him, nor did Mr. Bolgiano know anything about the contract* Ensor had made with him. To these statements he steadily adhered, and by no ingenuity of questioning could he be made to say the contrary.

It also appears that prior to this suit, Allen had made an affidavit before Cole, a magistrate, through whose agency Ensor had been employed in the damage case, as to what Bolgiano had said to him when the compromise was made. In reference to this affidavit, Cole says it was not made out by him from what Allen told him, but was sent to him written out by Mr. Ensor, and that Allen, after requiring some corrections to be made in it, swore to it after it was read over to him. It is needless to say, that this affidavit was not of itself evidence. Allen, however, was examined in regard to it, and testified that he could neither read nor write, and that he told Cole when it was read to him that there were some things wrong in it. One statement it contained was, that " Bolgiano said he did not want Ensor to get one cent;" but as to this Allen, testifies that " Mr. Cole got that wrong. I told him that Mr. Bolgiano said he did not like to see a lawyer make anything off of a poor man." And the witness repeated several times that this was what Mr. Bolgiano said, and that he *did not* say what is contained in the affidavit on that subject.

The plaintiff then called Mr. Bolgiano as a witness, and *proved by him* that in bringing about the compromise he acted solely at *the request of Allen* and in *his interest*, and endeavored to get the best terms he could for him, and did so; that when he met Allen he took the precaution to ask him if there *were any third parties to consult*, and he said "No." "I then asked him how much he wanted, and he said $1000, and I said will you pay your doctor's bill? and he said 'No.'" That after trying in vain to get $1000 for him, Allen said he would take $500, and I added, provided the company paid the doctor's bills. The case was accordingly compromised on that basis.

From this testimony, all of which, as we have said, was offered by the plaintiff himself, we think it plain that no rational mind could fairly deduce the inference necessary to support either the third or fourth count of the declaration. The whole effort on the part of the plaintiff seems to have been to induce the jury to believe that Allen, his own witness, was not entitled to credit in what he testified to on the stand, and to allow them to take as true the statements contained in an affidavit made out of Court, the truth of which the witness denied, simply because at the time he testified he was in the employment of the Turnpike Company; and to discredit Bolgiano, also his own witness, in what he testified to, because at the time the compromise was made he was a stockholder of the company. The case differs radically from one where the witnesses on one side are contradicted by those on the other. In our opinion a verdict in favor of the plaintiff under these counts, could in the face of this testimony, be based only upon vague suspicion or irrational conjecture. And in such case, it is according to all the authorities, the duty of the Court to instruct the jury that there is no evidence *legally sufficient* to sustain the action. We are fully satisfied that the Court below was fully right in thus ruling in this case, and that it would have been error to have ruled otherwise.

Ensor *vs.* Bolgiano.

Nor do we think there was any error prejudicial to the appellant in the ruling contained in the first exception. The fact that neither Hammond nor any one else had actually told Mr. Ensor that Allen "was a worthless, onery kind of a drunken man," could hardly tend even to prove that Mr. Bolgiano had not heard that a particular friend of Mr. Ensor had so told him. But even if this testimony were in the case, it would not alter our opinion as to the legal insufficiency of the evidence to support the action.

It follows from these views that the judgment must be *affirmed,* and this renders it unnecessary to express any opinion upon the question whether the law, as laid down in *Lumley vs. Gye,* 2 *Ellis & Black.,* 216, is applicable to the relation of attorney and client in this State, and to the contracts made between them in reference to compensation for professional services rendered, or to be rendered by the attorney in the prosecution of a suit like the one which was here compromised. If we had come to the conclusion there was error in the rulings complained of, it would become necessary for us to consider that question, and we refer to it now simply for the purpose of excluding the inference that we decide it one way or the other.

*Judgment affirmed.*

(Decided 22d April, 1887.)

YELLOTT, J., delivered the following dissenting opinion:

The appellant is an attorney at law, and as such, entered into a contract with one Allen to institute and conduct a suit against the President and Managers of the Baltimore and Yorktown Turnpike Company for the recovery of damages claimed by said Allen for injuries caused by the alleged negligence of the company's agents. By the terms of the contract the appellant was to receive one-

half of the damages recovered as a compensation for his professional services. After suit had been brought, the client, without the knowledge and consent of his attorney, executed a release to said company upon payment to him of the sum of five hundred dollars. The attorney was ignorant of this transaction until the case was called for trial, when the release was produced. He avers that his client was induced to break his contract by the false and malicious representations of the appellee.

This is an action on the case, and there are four counts in the declaration; the three first alleging the utterance of defamatory words by the defendant, resulting in special damages; and the fourth averring that the defendant, "by means of false and malicious statements, arguments and persuasions," induced and procured Allen to break his contract with the plaintiff.

That a contract for a contingent fee is valid has been determined by adjudication, and the question has been settled by the decisions of Courts of the highest authority. *Wylie vs. Cox*, 15 *Howard*, 415; *Stanton vs. Embry*, 93 *U. S.*, 556.

In *Howard, Lessee vs. Carpenter*, 22 *Md.*, 26, this Court, referring to the agreement made by Lady Stafford to give her attorneys twenty acres of land contingent upon their successful prosecution of her suit, said: "Her Ladyship dismissed them from her service and employed other counsel which it was competent for her to do, but she could not thereby deprive them of the benefit of her contract." And in the very recent case of *Cowler vs. Callon*, 7 *N. E. Reporter*, 169, the Court of Appeals of New York has decided that "the attorney may agree upon his compensation, and it may be contingent upon his success, payable out of the proceeds of the litigation."

It is evident that a contract of this nature confers a valuable right, and the question occurs whether a third party can interpose after the formation of such contract,

and wilfully and maliciously, by false and fraudulent statements, arguments and persuasions, destroy this right. It is clear that if he can perpetrate this wrong in one case he can in all cases in which the attorney is interested. If he can, with impunity, induce one client to break his contract, he can, with equal exemption from liability, induce any client the attorney has, to do so. The attorney's business might thus be ruined unless the law afforded him redress.

Does the law afford a remedy? It is said that for every wrong a remedy is supplied by the law of the land, and as an action on the case "is tied down to no form at all,"it is the appropriate remedy for a wrong to which no other remedy is applicable. *Jones vs. Gwynn,* 10 *Mod.* 219.

In *Winsmore vs. Greenbank, Willes Rep.,* 581, it is said : "A special action on the case was introduced for this reason, that the law will never suffer an injury and a damage without a remedy. There must be *damnum cum injuria.* By *injuria* is meant a tortious act." In *Chapman vs. Pickersgill,* 2 *Wils.,* 146, which was an action on the case for maliciously suing out a commission of bankruptcy, Lord Chief Justice PRATT said, "But it is said this action was never brought ; I wish never to hear this objection again. This action is for a tort; torts are infinitely various, not limited or confined ; for there is nothing in nature but may be an instrument of mischief." And in *Ward vs. Weeks,* 7 *Bing.,* 211, TINDAL, Ch. J., said, "Every man must be taken to be answerable for his own wrongful act."

In the later case of *Lumley vs. Gye,* 2 *Ell. & Blackb.,* 216, the Court of Queen's Bench decided that an action would lie for the malicious procurement of the breach of any contract, if by such procurement damage was intended to result and did result to the plaintiff; ERLE, J., saying, in accordance with the opinions of the majority of the Judges who sat in the case, that "He who maliciously procures a

damage to another by a violation of his right ought to be made to indemnify; and that, whether he procures an actionable wrong, or a breach of contract."

The principles thus enunciated by these eminent English Judges have been fully recognized by the American Courts; and it is held that in all cases where a man has sustained loss or damage by the wrong of another, he may have an action on the case to be repaid in damages; and that to maintain this action "it is not necessary that it should be supported by instances or precedents;" it is sufficient if it be covered by principle; for this action lies, in general, where one person sustains an injury by the misconduct of another, for which the law has provided no other adequate remedy. *Wright vs. Freeman*, 5 *H. & J.*, 475; *McFarland vs. Moore*, 1 *Tenn.*, 174; *Griffin vs. Farwell*, 20 *Vt.*, 151; *Hammond vs. Hussey*, 51 *N. H.*, 40.

At the trial of this cause, the defendant offered the following prayer, which was granted by the Court:

"The defendant prays the Court to instruct the jury that the plaintiff has offered no evidence to prove the utterance by the defendant, of the actionable words alleged in the declaration, and the plaintiff having produced no evidence to sustain the material averments of the declaration, the verdict must be for the defendant."

It will be seen that this instruction applies only to the three first counts in the declaration, "actionable words" having a technical meaning applicable to words which are defamatory. But there is a fourth count, not for actionable words spoken, but for maliciously persuading the plaintiff's client to break his contract. This is the wrong set forth in the fourth count, and if the latter portion of the instruction was intended to apply to this count it was too general, inasmuch as it did not state what material averment in this count the plaintiff had failed to prove. As one good count is sufficient to support the action, there is a still stronger objection to this prayer. In granting it

the Court assumes the truth of the plaintiff's evidence so far as it is pertinent to the issue. Now, Allen, the plaintiff's client, states in his testimony, and reiterates the statement, that it was in consequence of the representations of the defendant that he was induced to sign the release, and he also swears that the defendant said that he did not want the attorney to get a cent. Whatever weight might have been given by a jury to this testimony, it is, for the purposes of this demurrer to evidence, assumed to be true. Here then was evidence tending to support the averments in the fourth count. It is like a statement of facts agreed upon, and this Court has said, in *Howard, Lessee vs. Carpenter*, 22 *Md.*, 23, that "it is exclusively the province of the jury to find all inferences of facts from facts stated, while the Court is precluded from so doing, and is confined to the facts stated." It is apparent that the Court below should not have granted the defendant's prayer, and thus have taken the consideration of the facts in evidence from the jury.

The witness, Allen, testified that the defendant had stated to him that some one had told the plaintiff that his client was "an onery and worthless fellow," and further stated that in consequence of this information the plaintiff would not attend to his case. The plaintiff, during his examination, was asked, "Has anybody told you anything in reference to Mr. Allen, as to his being an onery and worthless fellow?" There was an objection to this testimony, and the plaintiff's counsel offered to follow it up by proof, that the person supposed by Allen to have given the information to the plaintiff, had never done so. The testimony of the plaintiff, denying that any one had made such a statement to him, would have been a contradiction of what the defendant had said to Allen, and was therefore admissible without corroboration. The Court excluded the testimony, and in so doing committed an error, as the averment in the fourth count of

the declaration, is that the defendant, by false and fraud ulent statements, arguments and persuasions, induced the client to break the contract which he had made with his attorney, and the evidence offered, tendered to support the averment, by proving that false statements had been made.

Controlled by the reasons thus stated, I am constrained to dissent from the opinion of the majority of the Court, and think that the judgment should be reversed and a new trial awarded.

(Filed 26th April, 1887.)

BRYAN, J., delivered the following dissenting opinion :

The declaration in this case contains four counts. The first and second aver that the defendant spoke certain false and defamatory words of and concerning the plaintiff, whereby he sustained damage. The third and fourth counts state that the plaintiff, an attorney at law, was employed by one Thomas F. Allen, to prosecute an action at law against the President, Managers and Company of the Baltimore and Yorktown Turnpike Road, for the recovery of ten thousand dollars damages for certain injuries sustained by said Allen through the negligence of said company, and that Allen contracted with the plaintiff, that he, the plaintiff, should receive one-half the amount which might be recovered in the action; that the plaintiff instituted the action, and was faithfully and honestly engaged in the prosecution of it; and that the defendant wrongfully and maliciously intending to injure the plaintiff, and to deprive him of his fee in said action, by means of certain false and fraudulent statements, arguments and persuasions, made said Allen believe that plaintiff would not attend to his case, or, if he did attend to it, would so overcharge him that he would have but a small sum left, and thereby induced and procured said Allen to break his contract with the plaintiff, and settle the said suit for damages without

the knowledge or consent of plaintiff, for a small and grossly inadequate sum, of which the plaintiff was to receive and did receive no portion whatever.

No one can doubt that a good cause of action is stated in the first and second counts. But it was strenuously maintained at the Bar that the averments in the third and fourth counts, if found to be true by the jury, would not entitle the plaintiff to a recovery. It is necessary to consider with some particularity the grounds on which the defendant is impleaded. It is stated that the plaintiff was in the pursuit of his regular occupation when the interference of the defendant took place. This occupation was one in all respects lawful, and the plaintiff was entitled to the fullest protection while he was engaged in the peaceful and legitimate exercise of it. Now the charge is that the defendant molested and hindered him in the transaction of his lawful business, that this molestation and hindrance arose from malicious motives, that it was carried into effect by false and fraudulent means, and that it caused a large pecuniary loss to the plaintiff. The plaintiff was prosecuting a lawsuit for a client; and the specific injury was that the defendant persuaded and induced this client to withdraw his suit from his lawyer's hands. Now it must be borne in mind that the complaint rests upon the motives, and the means by which this result was effected. Undoubtedly a man may give friendly advice to another about his lawsuits, as well as about any other business, and if given in good faith and with integrity and honesty of purpose and truthfulness of statement, he will not be liable to an action by any person whose interests may have been affected by his advice. The present question, however, has very different aspects; it was a matter of interest to the plaintiff to prosecute this lawsuit; it was in the ordinary course of his professional business; it was the direct exercise of the occupation by which he earned his livelihood. To withdraw a client from him, to persuade a client to

Ensor *vs.* Bolgiano.

violate his contract with him and thus prevent him from earning his professional fees would certainly entail loss upon him. Suppose such a thing were done with all his clients, it is easy to see that his business would be ruined. Now the question simply is, whether the law will permit a man to inflict this loss upon another by false and fraudulent means. The object is one which no man ought to desire; the means are such as all good men must detest. It is the pursuit of unworthy objects by most disgraceful means. In my judgment it is impossible to find any toleration for it in our enlightened jurisprudence.

A vast multitude of decided cases show the circumstances under which actions may be sustained for disturbing rights which the law recognizes. Let it be once ascertained that a party is entitled to a right; then any one who hinders or disturbs him in the exercise or enjoyment of it, is liable to an action, unless he can show some legal excuse or justification for his conduct. The principles laid down by Lord HOLT in his celebrated judgment in *Ashby vs. White, et al.*, are said by Judge STORY to be so strongly commended, not only by authority, but by the common sense and common justice of mankind, that they seem absolutely, in a juridical view, incontrovertible. According to the report in 2 *Lord Raymond*, 953, his Lordship said: "If the plaintiff has a right, he must of necessity have a means to vindicate and maintain it, and a remedy if he is injured in the exercise or enjoyment of it, and, indeed, it is a vain thing to imagine a right without a remedy; for want of right and want of remedy are reciprocal." It is not deemed necessary to fortify the opinion of these eminent jurists; yet it may be useful to make a few citations from high and acknowledged authorities. Every injury to a right imports a damage, though it does not cost the party one farthing, for wherever the plaintiff establishes some legal right or title in himself which has been invaded, weakened, or destroyed by the

Ensor *vs.* Bolgiano.

unlawful or malicious act of the defendant, there is a wrong and damage in law resulting therefrom, in respect of which an action is maintainable, for pecuniary compensation, though no actual pecuniary loss can be proved." "Every invasion of the plaintiff's right by the fraudulent act of the defendant entitles the plaintiff to some damages." "Interference by force or fraud with the free exercise of another's trade or occupation, or means of livelihood, is a tort—such as preventing people by the use of threats and intimidation from trading with the plaintiff's vessel in a foreign port—or dealing at the plaintiff's shop, or sending their children to the plaintiff's school, or placing obstructions and impediments in the way of the exercise of the right of free access to and from a man's place of business." * * "Where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, there an action lies in all cases." "Where the plaintiff's declaration of his cause of action set forth that he was a mason, and possessed a stone quarry, and quarried and dug stones therefrom, as well to sell as to build stone buildings, and that the defendant, intending to deprive him of the benefits of his quarry, disturbed his workmen, and all comers, threatening to maim and vex them with suits if they worked or bought stones there, whereupon all the buyers desisted from buying, and the workmen from working there, it was held that this was a great damage to the plaintiff and a good cause of action." *Addison on Torts, pp.* 9 *to* 14. In *Lumley vs. Gye*, 2 *Ellis and Blackburn*, 216, it was averred in the declaration that Johanna Wagner had contracted with the plaintiff to perform in his theatre for a certain time, with a condition that she should not sing elsewhere during the term without the plaintiff's consent, and that the defendant maliciously intending to injure the plaintiff, whilst the said agreement was in force and during the term, enticed and procured Wagner to break her contract, and to refuse to

perform. It was held by three Judges of the Queen's Bench against COLERIDGE, J., dissenting, that the plaintiff had a good cause of action. In this case, ERLE, J., said: "He who maliciously procures a damage to another by violation of his right, ought to be made to indemnify; and that, whether he procured an actionable wrong or a breach of contract." It is needless to multiply authorities on this question; but a few illustrations will be given, showing the way in which Courts of justice deal with malice and fraud. In *Levy vs. Langridge in the Exchequer Chamber*, 4 *Meeson & Welsby*, 337, Lord DENMAN used this language, "as there is fraud, and damage, the result of that fraud, not from an act remote and consequential, but one contemplated by the defendant at the time as one of its results, the party guilty of the fraud is responsible to the party injured." In *Moore vs. Schultz*, 31 *Md.*, 418; *Wanamaker vs. Bowes*, 36 *Md.*, 42, and many other cases in this Court, it was held that if an injury is committed with malice, the jury may give exemplary damages; and the same measure of damages prevails in cases of wrongs perpetrated by fraud. *Zimmerman vs. Hilser*, 32 *Md.*, 274. It would be an exceedingly difficult matter to find any reputable authority which holds the contrary. It is not a question in the case whether the plaintiff would have recovered a judgment in the suit which he was prosecuting for Allen. The injury to him consists in the wrongful interference with his means of livelihood.

On the prayer of the defendant the Court instructed the jury that there was no evidence to sustain the material averments of the declaration, and that the verdict must be for the defendant. At the trial the plaintiff offered in evidence an affidavit made by Allen, in which it is stated as follows: "That the said Bolgiano stated to him that from what he had heard, John T. Ensor, attorney for plaintiff in said suit, would not attend to it; that if he did attend

to it, he would so charge him for everything he did, that the plaintiff would not get but a small sum out of his claim for damages against said company; that he, Allen, told said Bolgiano, that his attorney, Ensor, had an interest in said suit, and Bolgiano said he did not want Ensor to get one cent; that from what said Bolgiano said to him the impression was made on his mind that his said attorney would not attend to his case, and that even if his said attorney should go on with the case, that he would so conduct it that he, the plaintiff, would be taken advantage of by his said attorney, and that the said attorney would get all or very nearly all the money, and he, the plaintiff, would not get more than a small sum, and that is the reason he accepted from said company five hundred dollars in settlement of his said case, and gave to said Bolgiano for said company a release for the settlement of said case, without the knowledge or consent of his said attorney who brought the suit, and who was interested in it." The record shows that this affidavit was offered generally, and that no objection was made to its admissibility when it was offered, or at any other time. There is no principle known to the law of this State, which under these circumstances would authorize the Court to withdraw it from the consideration of the jury. In *Dent vs. Hancock*, 5 *Gill*, 120, hearsay evidence had been offered without objection, and it was held that it was not competent for the Court to instruct the jury that it was not admissible. This Court said: "Whether the objections taken to the testimony were well founded or not, it is deemed unnecessary to inquire, because they were not made in due time. It is the duty of counsel, if aware of the objections to its admissibility, to object to the testimony at the time it is offered to be given, or if unapprised of such objections at the time the evidence had gone to the jury, he must raise his objections within a reasonable time thereafter." The rule thus established has always been followed in practice. It was stringently

applied in *Washington Fire Insurance Company vs. Davison and Symington*, 30 *Md.*, 92; and in *Barton Coal Company vs. Cox*, 39 *Md.*, 1.    But there was other evidence proper for the jury to consider.    Allen in his testimony stated that Bolgiano sent him word that he would like to see him at Dr. Rankin's office.    Being asked what Bolgiano said to him, he said: "Well, he said he wanted to see me about compromising the case; he asked me what I wanted, and I told him a thousand dollars, and he said he didn't think he could get that for me, but he thought he could get five hundred dollars, and would have to try to get my doctor's bill paid; so I told him, 'all right.'    I staid there a little while and talked a little longer, and he said, 'if you gain the suit, no doubt the company will take an appeal, and by the time your lawyers—he didn't mention any name at all—one or two —he just said by the time my lawyers got through, I might not have but a very small sum coming to me no doubt;' and then he mentioned about Mr. Ensor's friend, he said, 'a particular friend of Mr. Ensor's told him that I was a worthless onery kind of a drunken man;' he said he had heard Mr. Ensor's particular friend had told Mr. Ensor that, and I pitched;—I asked him who it was, and he would not say; so I pitched on Charles Hammond out there, the only gentleman I know who is a particular friend of Mr. Ensor's; so then I come to the conclusion that I would settle the case, not having heard from Mr. Ensor." (*Page* 8 *of Record.*)    Allen stated in his testimony (*Page* 10 *of Record,*) as follows: "I told him, plaintiff, Mr. Bolgiano said a very particular friend of his told him I was an onery worthless kind of a man—drunken man."    And on *page* 11 *of record*, he states : This particular friend of Mr. Ensor's telling him I was an onery worthless kind of a man, and I not having heard from Mr. Ensor, so I came to the conclusion there must be some truth in it, and I settled the case."    And on same page: "What I meant is

this: the party whoever told Mr. Ensor this, must have told him so to get him not to attend to the case, and then I came to the conclusion to settle it at once." And on same page being asked this question: "Then what I understand you to mean by saying there was some truth in it, is, that you came to the conclusion there must be some truth in the report that Mr. Ensor would not attend to your case ; Mr. Bolgiano did not tell you, Mr. Ensor would not attend to your case ?" He answers: "I made that up in my own mind from what Mr. Bolgiano told me in Dr. Rankin's office; then I made up my mind to settle the case." And on page fifteen, he states; "All I recollect is that Mr. Bolgiano was told that a particular friend of Mr. Ensor's told him I was an onery worthless kind of a man, and I came to the conclusion, from them, to settle the case." Allen at the time of the trial was in the employment of the Baltimore and Yorktown Turnpike Road, and was evidently a very unwilling witness for the plaintiff. He gave a good deal of other testimony; much of it evasive, irrelevant and inconsecutive. My present purpose is not concerned with this aspect of it. It is more important to ascertain what conclusions it was competent for the jury to draw from the evidence which I have quoted. The affidavit was contradicted in some points by Allen's testimony; and . the evidence above cited was varied and qualified by him in the course of his examination in some particulars. But I suppose it was for the jury to decide what portions of the testimony they would believe. If a part of the testimony of a witness is favorable to the party who called him, and another part is unfavorable, there is no rule of practice which authorizes the Court to compel the jury to disregard that which is favorable, and to accept the unfavorable. The jury have the unqualified right to believe such portions of the evidence as they see fit to credit, and to reject the remainder of it. And the Court cannot control them in the exercise of their functions in this regard. It is a great

mistake to suppose that a party is bound by the testimony of a witness whom he has put on the stand. *Greenleaf* states the accepted rule on this subject, *(sections* 442 *and* 443, 1*st vol:)* "When a party offers a witness in proof of his cause, he thereby, in general, represents him as worthy of belief. He is presumed to know the character of the witnesses he adduces; and having thus presented them to the Court, the law will not permit the party afterwards to impeach their general reputation for truth, or to impugn their credibility by general evidence, tending to show them to be unworthy of belief. * * * * But it is exceedingly clear that the party, calling a witness, is not precluded from proving the truth of any particular fact, by any other competent testimony, in direct contradiction to what such witness may have testified." The evidence which has been cited above certainly tends to prove that Bolgiano induced Allen to believe that the plaintiff would not attend faithfully to his lawsuit, and that he would treat him with injustice; and that in consequence of the belief thus produced on Allen's mind, he withdrew the suit from the plaintiff,s hands. The imputation was a serious one to make against a professional man. It was well calculated, if true, to injure his business; and the immediate effect of it was to deprive him of the management of the suit in question. The law wisely holds a person responsible for defamatory words spoken of another, unless the speaker can prove them to be true. In other words, *prima facie,* they are held to be false; and because they are false, they are malicious. In *Folkard's Starkie on Slander, section* 9, we find the law thus stated: "The law always presumes in favor of innocence, and therefore does not require a plaintiff to prove the falsity of the alleged calumny; on the contrary, it imposes the burden of proving the affirmative on the defendant; the truth of the supposed slander is, in effect, a ground of justification, which must be substantiated by the defendant." In the present case there

is no surmise or pretence that the imputations on the plaintiff were true. If the jury believed that they were made, they were required to deal with them as stamped by the law with falsehood and malice. It seems to me that the ruling of the Court below was erroneous.

There was another exception. The plaintiff proposed to prove by his own testimony, that no one had ever said to him that Allen was an onery worthless fellow, and also proposed to prove by Charles Hammond, that he had never made any such statement to the plaintiff. The Court refused to permit the evidence to be given. This evidence tended to show with perfect distinctness, that the information was untrue, which it was alleged that Bolgiano had given to Allen, as an inducement to take his suit out of the plaintiff's hands. It has been said that this evidence does not prove that Bolgiano *had not heard* that this statement had been made to the plaintiff. If a man circulates a false report he cannot escape from responsibility by alleging that he had heard it from another person. "As great an injury may accrue from the wrongful repetition as from the first publication of slander; the first utterer may have been a person insane, or of bad character. The person who repeats it gives greater weight to the slander. A party is not the less entitled to damages in a Court of law for injurious matter published concerning him, because another person previously published it. That shows, not that the plaintiff has been guilty of any misconduct which renders it unfit that he should recover damages in a Court of law, but that he has been wronged by another person as well as by the defendant, and may, consequently, if the slander was not published by the first utterer on a lawful occasion, have an action for damages against that person as well as the defendant." "The existence of a slanderous rumor does not justify the repetition of it, unless it can be shown that such repetition was made on a justifiable occasion, or that the rumor was true.

It is no justification to show that the rumor did exist, and that the defendant merely repeated it as a rumor." *Folkard's Starkie on Slander*, section 318, and cases there cited. Bolgiano being examined as a witness does not say that this information was true; or even that he believed it to be true. By this ruling, the plaintiff was prevented from proving that it was false. I know of no reason why he should not have been allowed to prove the unlawful character of the means by which he was injured.

(Filed 10th May, 1887.)