## STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY *v.* WHITE

[No. 678, September Term, 1966.]

*Decided December 13, 1967.*

*Motion for rehearing filed January 11, 1968; denied January 17, 1968.*

The cause was argued before HAMMOND, C. J., and MARBURY, McWILLIAMS, FINAN and SINGLEY, JJ.

*John B. Robins,* with whom were *Stanley G. Robins* and *Robins & Robins* on the brief, for appellant.

*Richard M. Pollitt,* with whom were *Pollitt, Hughes & Bahen* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

The question presented by this appeal, one which this Court has never been required to decide, involves the duty an insurer owes to its insured when there is an opportunity to settle the claim within the limits of the insured's liability policy. Appellant-insurer refused several offers to settle within the policy limits, and as a result, after prolonged litigation terminating in an appeal to this Court, a judgment was rendered against appellee-insured for a figure well in excess of the policy coverage. Appellee White brought suit against his insurer alleging both negligence and bad faith in refusing to settle. A jury returned a verdict in favor of White and judgment was entered for the full amount of the excess over the policy limits. From the denial of defendant's motions for directed verdict and for judgment n.o.v. or new trial, this appeal was taken.

In November of 1961, appellee White was involved in an automobile collision with one Savage. Paul Mills was a passenger in the White vehicle. At the time of the mishap, White was insured by appellant against liability to the extent of $10,000 to any one person injured as a result of White's negligence.

Mills brought suit against both drivers in June of 1963, claiming damages of $30,000, well in excess of appellee White's insurance coverage. However, White declined to retain an attorney of his own choice to represent his personal liability exposure and relied entirely on the insurer's counsel. After reviewing the facts and after interviewing appellee and Mills, the plaintiff in the lawsuit, the insurer's counsel, by a letter dated November 25, 1963, communicated his conclusions to the insurer, portions of which stated:

> "There is no authority which we can find anywhere, either to support or to refute the proposition of the Plaintiff. We are confident, however, that when the question is presented the Court will rule that a stop sign does not require a vehicle to stop

at that sign, especially where there is a stop line, but only at that point where it will avoid conflict with favored traffic, and while its driver still has the opportunity to see whether it may enter the through highway safely.

\* \* \*

"On the material which we presently have before us, therefore, we would be extremely hopeful of a directed verdict on the issue of White's negligence, although it may be necessary to take the case to the Court of Appeals to obtain it. Certainly there is a very strong hope of a favorable jury verdict on the issue of White's negligence.

\* \* \*

"We are of the opinion, however, that, at worst, Savage's operation of his motor vehicle raises a question of fact for the jury in this case, and we believe that the jury will undoubtedly find that his conduct was a proximate cause of the accident, regardless of how they may feel about the driving of White."

Starting in January of 1964, a series of settlement offers were made by the attorney for Mills to the State Farm adjuster. His first offer was $15,000 in full settlement of the claim, and to this offer the adjuster agreed on behalf of State Farm to contribute 50% if Savage's insurer would contribute the balance. However, Savage's insurer refused to contribute more than $5,000. On January 21, 1964, two days before trial, Mills' attorney reduced the demand to $12,500. State Farm again agreed to contribute one-half ($6,250) if Savage's insurer would do likewise, but the latter adhered to its original settlement figure of $5,000. Finally, on the day of the trial, as proceedings were about to begin, Mills' attorney delivered to the insurer's counsel a written offer to give a joint-tortfeasor's release in favor of White if State Farm would pay $10,000, the policy limit. Insurer's counsel left the courtroom, and called the adjuster to inform him of the new offer. The adjuster replied that the insurer would buy a release for no

more than $6,250, one-half of the $12,500 offer previously made.

The trial resulted in a verdict in the amount of $17,495 against both defendants; however the Court of Appeals reversed the judgment against defendant Savage and affirmed as to defendant White. See *Savage v. Mills, Adm'x,* 237 Md. 204, 205 A. 2d 239 (1964). White then instituted this action against his insurer.

It should be noted that at all times during the course of the original litigation, White steadfastly maintained his innocence based upon his experience as a former Maryland state trooper. Insurer's attorney was of the opinion that the plaintiff's case might, at the most, be worth $20,000. Even if a verdict were rendered against both defendants for that full amount, White would only be liable for one-half or $10,000, still within the limits of his policy. However, the insurer's counsel knew that White did not stop at a stop sign, and conveyed this information to the insurer, adding that it was difficult to put a firm evaluation on the case, and that it might have to go to the Court of Appeals in order to obtain a directed verdict in favor of White. It should also be remembered that under any of the offers of settlement made by Mills' attorney, State Farm could have obtained a release for White by paying an amount within the limits of the policy. Finally, it should be noted that neither the State Farm adjuster nor its counsel informed White about the offers of settlement.

Heretofore, in *Sweeten, Adm'r v. National Mutual Insurance Co.,* 233 Md. 52, 194 A. 2d 817 (1963), this Court was presented with a case involving suit by the insured's administrator against the insurer to recover $9,000, the amount of the judgment rendered against the insured in excess of the $10,000 policy limit. The insured brought suit on the theory that the insurer was guilty of bad faith and negligence in not settling the damage suit brought against the insured when it had an opportunity to do so, prior to the judgment being rendered against the insured in the amount of $19,000. However, the case reached this Court on an appeal from the lower court's action in sustaining a demurrer to the insured's declaration. The lower court not having heard *Sweeten* on the

merits, it was unnecessary for this Court to adopt a definitive theory as to when liability would result from an insurer's failure to settle within the policy limits. The case also turned on the point of whether the insured could maintain suit to recover prior to actual payment of the excess portion of the judgment.

In reversing and remanding *Sweeten,* Judge Henderson cast much illumination on the question of the duty owed by the insurance carrier to its insured to effect settlement within policy limits:

> "'The prevailing view appears to be that recovery should be rested on the theory of bad faith, because the insurer has the exclusive control, under the standard policy, of investigation, settlement and defense of any claim or suit against the insured, and there is a potential, if not actual, conflict of interest giving rise to a fiduciary duty. See *Brown v. Guarantee Insurance Company,* 319 P. 2d 69 (Cal.), and a note on the case in 72 Harv. L. Rev. 568; *Murray v. Mossman,* 355 P. 2d 985 (Wash.) ; *Francis v. Newton,* 43 S. E. 2d 282 (Ga.) ; and cases collected in 40 A.L.R. 2d 168. See also the notes in 16 Okla. L. Rev. 110; 24 Ohio State L. J. 393; 15 Ark. L. Rev. 401; [1958] Ins. L.J. 404; Keeton, *Liability Insurance & Responsibilities for Settlement,* 67 Harv. L. Rev. 1136. All authorities seem to agree that the liability is in tort, not in contract, although arising out of a contractual undertaking. But many courts hold that the obligation is not merely to exercise good faith but to use due care. Professor Keeton seems to think that there is no practical difference in the results, since on either theory the question is one for the jury. Many courts allow recovery on both theories, and some courts that restrict recovery to bad faith permit evidence of negligence in the proof. In view of the appellee's concession, we see no reason to choose between the two theories in the case at bar." 233 Md. at 55.

Some two years after *Sweeten,* the Maryland Federal District Court in *Gaskill v. Preferred Risk Mutual Insurance Company,* 251 F. Supp. 66 (D. Md. 1966) had a similar case tried before it on the merits. Chief Judge Thomsen, in a review of the law on the matter, said:

> "It seems clear that the duty includes elements both of good faith and of reasonable care. This Court concludes that the proper test of liability in such a case as this (and the test which this Court believes the Maryland Court will probably apply when required to decide the question) is the good faith test, with the amplifications and limitations suggested by the quotations from the New Jersey Court [*Radio Taxi Service, Inc. v. Lincoln Mutual Insurance Co.,* 31 N. J. 299, 157 A. 2d 319 (1960)], the Fourth Circuit [*American Casualty Company of Reading, Pa. v. Howard,* 187 F. 2d 322 (4th Cir. 1951)] and Judge Watkins [*Lee v. Nationwide Mutual Insurance Co.,* 184 F. Supp. 634, 638 (D. Md. 1960)], set out above." 251 F. Supp. at 68.

The New Jersey case referred to by Judge Thomsen amplifies the good faith test by stating:

> "Those gifted with expertise in the field of judging issues of liability and extent of injury actually suffered by a plaintiff, would probably be the first to admit that an informed judgment arrived at in good faith after reasonably diligent investigation represents the limit that should be demanded of human capacity." 157 A. 2d at 327.

The Fourth Circuit case referred to, *American Casualty Co. of Reading, Pa., supra,* speaks at p. 329 of the insurer's counsel having to act "reasonably, in good faith and without negligence," and Judge Watkins in *Lee, supra,* stated:

> "However an insurer is obligated to exercise a reserved power to negotiate and settle with proper regard for the interest of the insured, and is liable for

damage resulting from wrongful failure to settle within policy limits." 184 F. Supp. at 638.

Consonant with the expression of Judge Thomsen in *Gaskill,* is the following statement found in 7 Am. Jur. 2d *Automobile Insurance* § 156, p. 486 (1963) :

> "And in a large number of the more recent cases the two tests of 'good faith' and 'negligence' have tended to coalesce, with many of the courts which have in terms rejected the 'negligence' test agreeing, nevertheless, that the insurer's negligence is a relevant consideration in determining whether or not it exercised the requisite good faith."

It should be borne in mind that when employing the term "good faith" in conjunction with the actions of the insurer in these cases, the courts do not intend to connote or imply by the use of the term that dishonesty, misrepresentation, deceit or a species of fraud must be present. Obviously, if fraud is attendant as an element of motivation on the part of the insurer, liability will attach. However, "good faith" and its converse concept "bad faith" as used in these cases means something not per se related to fraud, as expressed by 3 Appleman, *Insurance Law and Practice* § 1612 (1967) :

> "The expression 'in good faith' has been held to refer to a lack of a good moral intent as the basis for refusing to pay a loss. Conversely, 'bad faith' means any frivolous or unfounded refusal to pay; it is not necessary that such refusal be fraudulent. And if probable cause is shown why payment should have been made, an inference of bad faith might thereby be raised."

We believe this terminology was placed in proper context by the Appellate Court of Illinois in *Cernocky v. Indemnity Ins. Co. of North America,* 216 N. E. 2d 198 (Ill. App. 1966), wherein the Court stated:

> "We agree that the words 'good faith' and 'bad faith' are not particular words of art as used here.

They mean either being faithful or unfaithful to the
duty or obligation that is owed." *Id* at 203.

In applying the "good faith" theory the courts have found
that the presence of one or more of the following acts or cir-
cumstances may affect the "good faith" posture of the insurer:
the severity of the plaintiff's injuries giving rise to the likeli-
hood of a verdict greatly in excess of the policy limits; lack of
proper and adequate investigation of the circumstances sur-
rounding the accident; lack of skillful evaluation of plaintiff's
disability; failure of the insurer to inform the insured of a
compromise offer within or near the policy limits; pressure
by the insurer on the insured to make a contribution towards
a compromise settlement within the policy limits, as an induce-
ment to settlement by the insurer; and actions which demon-
strate a greater concern for the insurer's monetary interests
than the financial risk attendant to the insured's predicament.
See *Brown v. United States Fidelity and Guaranty Co.*, 314
F. 2d 675 (2d Cir. 1963); *Home Indemnity Co. v. William-
son*, 183 F. 2d 572 (5th Cir. 1950); *Southern Farm Bureau
Casualty Ins. Co. v. Hardin*, 233 Ark. 1011, 351 S. W. 2d
153 (1961); *Communale v. Traders & General Ins. Co.*, 50
Cal. 2d 654, 328 P. 2d 198 (1958); *Ivy v. Pacific Automobile
Insurance Co.*, 156 Cal. App. 2d 652, 320 P. 2d 140 (1958);[1]
*Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S. W. 2d 750
(1950); *Radio Taxi Service, Inc. v. Lincoln Mut. Ins. Co.*,
31 N. J. 299, 157 A. 2d 319 (1960); *Hilker v. Western Auto-
mobile Ins. Co.*, 204 Wis. 1, 231 N. W. 257 (1930), reh. 235
N. W. 413 (1931); *Western Casualty and Surety Co. v.
Fowler*, 390 P. 2d 602 (Wyo. 1964); Annot., 40 A.L.R. 2d
168 (1955).

Labels, in an inexact science as the law, are more often
noxious than helpful; courts, understandably, are reluctant to
apply them to legal theories and abstract principles. However,
they are helpful in the necessary pursuit of ascertaining the
weight of legal authority by giving identification to the rule
adopted within a jurisdiction.

---

1. "California has recently aligned itself with the jurisdictions
that apply the bad faith test." 320 P. 2d at 146.

In the case at bar, the facts, the instructions of the lower court and the verdict of the jury can all be accommodated within the good faith theory of *Gaskill,* which embraces elements of reasonable care. The lower court in its instructions to the jury stated: "The duty includes elements both of good faith and of reasonable care [substantially the rule in *Gaskill*]. * * *. [Y]ou cannot find a verdict in this case in favor of the plaintiff unless you find from the evidence that the defendant, its attorneys or agents, were guilty of negligence or bad faith * * *." Elsewhere in the instructions the court described the insurer's duty as one of "good faith and due care." We think Chief Judge Duer came sufficiently close to *Gaskill* to have been free from error. Also, no exceptions were filed to his instructions.

Based on our review of the authorities and a wealth of cases on this question, we are persuaded that for an insurer to measure up to the good faith test, its action in refusing to settle must consist of an informed judgment based on honesty and diligence. Furthermore, the insurer's negligence, if any there be, is relevant in determining whether or not it acted in good faith.

In the instant case the record reveals there was evidence from which the jury could have concluded that the investigation by the adjusters for the insurance carrier was not sufficient for trial purposes. There was further evidence that the attorney who represented the insurer recognized that the site of the accident presented an unusual situation, insofar as making a determination as to whether or not the configuration of the streets created an intersection, thus prompting him to describe it as an "odd ball" case; and although he felt that the insured would prevail, he thought the case might have to go to the Court of Appeals for a favorable adjudication. This indicates the insurer should have recognized the risk involved in the litigation.

There was also evidence that the offers of compromise settlement had not been communicated to the insured, thus depriving him of an opportunity to contribute any sum toward a settlement had he been so disposed. The testimony of the insured's attorney shows, and we might add as a testimonial to his professional expertise, that he had made a very accurate

evaluation of the potential verdict, predicting that it would be somewhere between $15,000 and $20,000. This amount was obviously in excess of the $10,000 policy limits, were the insured to be held solely responsible, as events proved to be the case. In such a situation the conflict between the insurer and the insured's interests presents the moment of truth. There was evidence from which the jury could have construed as an artificial and arbitrary limitation on settlement, the policy adopted by the insurer that come what may it would not contribute more than 50% toward settlement. This became particularly significant when we realize that initially the insurer was willing to contribute $7,500 towards the $15,000 settlement offer, on the condition that the insurance carrier for Savage contribute a like amount. Later, when the second compromise offer of $12,500 was made, the insurer would not contribute $7,500 towards this settlement. Although originally willing to contribute that amount on a fifty-fifty basis for settlement on the first offer, it agreed only to contribute $6,250 or 50% to this second offer.

These factors supported by the evidence were all matters which the jury could have properly considered in their deliberations, together with such inferences, favorable to the plaintiff, as may reasonably be drawn from them. *Southern Farm Bureau Casualty Ins. Co. v. Mitchell,* 312 F. 2d 485 (8th Cir. 1963). Under the circumstances we think the lower court would have been in error if it had granted the insurer's motion for a directed verdict or for judgment n.o.v.

The jury having considered the evidence under proper instructions, we think the judgment of the lower court should be affirmed.

*Judgment affirmed, appellant to pay the costs.*