492 A.2d 977

**Ronald M. SHARROW, Chartered**

v.

**STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, et al.**

**No. 1352, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

May 23, 1985.

David Freishtat, Baltimore (W. Michael Mullen and Freishtat & Sandler, Baltimore, on the brief), for appellant.

Michael J. Budow, Bethesda (Richard E. Schimel and Budow and Noble, P.C., Bethesda, on the brief), for appellees.

Argued before WILNER, BLOOM and ROBERT M. BELL, JJ.

WILNER, Judge.

Appellant Ronald M. Sharrow is an attorney. Appellees are, respectively, an automobile insurance company (State Farm) and two of its employees (Burns and Rinehardt). In a three-count complaint filed in the Circuit Court for Baltimore City, appellant claimed that, in negotiating and settling a claim directly with his client, appellees tortiously interfered with his attorney/client contingent fee contract.

The case reaches us from the sustaining of appellees' demurrer (which, by virtue of new Md.Rules 2–302 and 2–322, the court treated as a motion to dismiss) and the judgment entered thereon. The issue, then, is whether, assuming the truth of all well-pleaded allegations of fact, appellant's complaint "state[s] a claim upon which relief can be granted." Md.Rules 2–322(b)(2).

By way of introduction in Count I, appellant avers that on December 29, 1983, he was retained by one Donald P. Zorbach to pursue a claim for injuries sustained by Zorbach in an automobile accident; that Zorbach agreed to pay him a contingent fee of either one-third or 40% of all amounts recovered, depending on whether suit had to be filed; that he notified State Farm, the insurer of the vehicle in which Zorbach had been riding, of his employment and made claim on Zorbach's behalf; and that State Farm acknowledged the claim and corresponded with appellant's office in connection with it.

We pick up, then, from Count I, against State Farm:

"11.  On or about February 20, 1984, Zorbach advised Sharrow he was in desperate financial condition and requested that Sharrow lend him money.  Sharrow declined and advised Zorbach that it is unethical for an attorney to make a loan to a client.  Zorbach was further advised that it was not the practice of an insurance carrier to advance money against a settlement and it *would be unwise to approach State Farm with such a request.*

12.  Due to his dire financial condition, Zorbach, on or about February 21, 1984, contacted State Farm and requested an advance.  Zorbach acted without Sharrow's knowledged [*sic*] or acquiescence and contrary to Sharrow's advice.  State Farm ... denied Zorbach's request *and instead negotiated a settlement of Zorbach's claim for $2,500.00.*  Zorbach was directed to go to the Harford Road office to execute certain documents to *finalize the settlement.*

12.  [*sic*] Zorbach went to State Farm's offices as directed and executed a release.  Zorbach was also required by State Farm ... to execute a document discharging Sharrow as his attorney and stating that he had advised Sharrow of his intention to settle directly with State Farm.  This written statement was false and was known by State Farm to be false.  (See Exhibit 7 attached hereto.) [1]

---

1.  The document attached as Exhibit 7 states:

13. State Farm ... was aware of the existence of a contractual agreement between Sharrow and Zorbach and had full knowledge that the contractual agreement was in existence at the time of the settlement negotiations with Zorbach.

14. State Farm ... intentionally, willfully and maliciously interferred [*sic*] with Sharrow's contractual rights *by negotiating with Zorbach while he was still represented by Sharrow, by causing Zorbach to terminate Sharrow's representation without Sharrow's knowledge, and by requiring that Zorbach falsely state, in writing, that he had advised Sharrow of his intention to deal directly with State Farm.*

15. State Farm's actions in interferring [*sic*] with Sharrow's contract rights were perpetrated solely to injure Sharrow and wrongfully deprive it of the benefit of its contract with Zorbach." (Emphasis added.)

"I, DONALD ZORBACH, hereby certify that I have discharged Ronald Sharrow as my attorney relative to his representation for an automobile accident which I was involved in on 12/24/83 while a passenger in the vehicle operated by Gilbert Merson.

I further certify that I have advised Ronald Sharrow of my intention to settle my injury claim directly with State Farm Insurance Company.

DATED: _____ (SEAL) _____
　　　　　　　　　　　　　　　　　　　　　　　DONALD ZORBACH

It is further understood that my signing of the Release forever discharges Gilbert E. Merson, his heirs, executors, administrators, agents and assigns, and all other persons, firms or corporations liable or who might be claimed to be liable, none of whom admit any liability to the undersigned.

I also understand that any additional medical expenses will be paid under the No-Fault provisions of the Merson policy, which are accident related, the statute in the State of Maryland being 3 years from the date of loss.

　　　　　　　　　　　　　　　　(SEAL) _____
WITNESS: _____ "

Count II was against Burns. After incorporating into it the allegations contained in Count I, appellant averred that Burns was the claims adjuster assigned to the Zorbach claim, that she knew of his employment by Zorbach, and that, in addition to interfering with appellant's contract as alleged in paragraph 14, *ante,* "Burns further interfered with Sharrow's contract rights by stating to Zorbach that since it was Zorbach, not Sharrow, *that settled the claim,* Sharrow should not receive a fee for legal services." (Emphasis added.)

Count III was against Rinehardt, who was "the Supervisor of Burns with full knowledge of, and control over, her actions." Appellant incorporated by reference all allegations made in Counts I and II, adding, in relevant part, that:

"22. Subsequent to learning of the settlement with Zorbach, Sharrow contacted Rinehardt by telephone to discuss Burns' conduct *and to demand that a fee be paid to Sharrow.* Rinehardt refused to discuss the matter and abruptly terminated that conversation.

23. Rinehardt was aware of the acts perpetrated by Burns and participated with Burns in maliciously interfering with Sharrow's contract rights.

24. Rinehardt failed to take appropriate action to correct the conduct of Burns despite being specifically informed of her conduct by Sharrow and further refused to honor Sharrow's demand that a fee be paid in accordance with the contractual agreement with Zorbach.

25. Rinehardt intentionally, willfully and maliciously interfered with Sharrow's contract rights *by participating in, and refusing to correct, the acts of Burns and by refusing to honor Sharrow's claim to a fee."* (Emphasis added.)

Whether these averments, assuming them to be true, suffice to state an action for intentional interference with contract is a question of first impression in Maryland.

Nearly a century ago, in *Ensor v. Bolgiano,* 67 Md. 190, 9 A. 529 (1887), the Court had a similar issue before it.

Thomas Allen, injured on a turnpike, engaged Ensor as an attorney to sue the turnpike company; Ensor was to receive half the recovery as his fee. In August, 1883, Ensor filed suit for $10,000. In January, 1884, Allen, on his own, settled the case for $500 and gave the company a release. Ensor thereupon sued Bolgiano, a stockholder of the turnpike company who had negotiated the settlement with Allen, seeking, among other relief, damages for maliciously inducing Allen to break his contract with Ensor.

Unlike the instant case, Bolgiano did not test the sufficiency of Ensor's averments by preliminary motion, but permitted the case to go to trial. The evidence showed that, when Bolgiano called Allen and negotiated the settlement, Allen was unaware that the suit had been filed as he had heard nothing from Ensor, and Bolgiano knew nothing of the contract that Allen had with Ensor. Without contradiction, Bolgiano said that he acted solely at Allen's request and that Allen denied there were "any third parties to consult."

On this evidence, the trial court directed a verdict for the defendant, which the Court of Appeals affirmed. Having concluded that the evidence was insufficient to warrant any verdict for Ensor, the Court declined to address the underlying legal question of whether an action for tortious interference with contractual relations, as recognized by the Court of Queen's Bench in *Lumley v. Gye*, 2 E. & B. 216 (1853), "is applicable to the relation of attorney and client in this State, and to the contracts made between them in reference to compensation for professional services rendered. . . ." 67 Md. at 201, 9 A. 529.[2]

---

**2.** Bolgiano argued that it would be contrary to public policy to apply the tort recognized in *Lumley v. Gye* to attorney-client contracts in favor of the attorney. The client, he urged, was *dominus litus* "and the rights of the attorney, as respects the prosecution of the suit, are subordinate to his." Thus, "[i]t cannot be a legal wrong committed against an attorney, to recommend his client stop the litigation." 67 Md. at 195, 9 A. 529. A majority of the Court (five judges), as noted, declined to address that issue. Two judges, in dissent, rejected Bolgi-

That question, theoretically, is still an open one. The Court of Appeals has recognized the general proposition "that a third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party." *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744 (1981), and cases cited therein. The Court has not had occasion since *Ensor*, however, to consider whether that tort applies to professional service agreements between attorney and client and, if so, what type of conduct will suffice to create liability.

Although a different rule has apparently been adopted in Massachusetts (*see Walsh v. O'Neill*, 350 Mass. 586, 215 N.E.2d 915 (1966)), we see no reason why attorney-client agreements should be regarded as pariahs in the eyes of the law—why they, like most all other contracts, should not be protected against tortious interference by third parties. Whether viewed from the perspective of the lawyer or the client, it is not against public policy to preclude outsiders from improperly inducing either one to repudiate a valid contract he has made with the other; indeed, it would be contrary to public policy not to preclude such interference.

From the point of view of the client, the harm that may result from the improper disruption of his retainer agreement, especially at the hands of one whose interest is adverse to his own, is all too obvious. The lawyer too has a legitimate interest in his employment contracts, notwithstanding their revocability at the will of the client. As the text writers point out, the tort in question is one of several aimed at discouraging improper interference with economic relations and relationships (*see, for example,* Prosser and Keeton, *Law of Torts*, 5th ed. (1984), ch. 24; Harper and James, *The Law of Torts*, ch. VI; *Restatement of Torts 2d*, ch. 37), and we see no reason, in that regard, why lawyers

---

ano's argument and opined not only that the tort was cognizable with respect to attorney-client employment agreements but that Bolgiano, by his conduct, had indeed committed the tort.

should be treated differently than any other group of professionals, or, for that matter, anyone in the world of commerce. This, indeed, is the position taken by most of the courts.

The problem, in our judgment, is not with encompassing attorney-client employment agreements within the aegis of the tort, but in determining whether the particular conduct of a third party is actionable. As to that, the argument made by Bolgiano long ago has some force, for there is no doubt but that a client has the right

> "at any time before judgment, if, acting in good faith, to compromise, settle or dismiss his cause of action without his attorney's intervention, knowledge or consent. The attorney in such case, under mere contract of employment, acquires no vested interest in the suit, and his authority is revocable at the will of the client."

*Boyd v. Johnson*, 145 Md. 385, 389, 125 A. 697 (1924); *Palmer v. Brown*, 184 Md. 309, 40 A.2d 514 (1945); *Maddox v. District Supply, Inc.*, 222 Md. 31, 37, 158 A.2d 650, *cert. denied* 364 U.S. 872, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960).

A good synthesis of the respective rights of the client to terminate the employment at will and of the attorney to have his contract free from malicious interference by third parties was stated by a *nisi prius* court in New York. In *Gordon v. Mankoff*, 146 Misc. 258, 261 N.Y.S. 888, 889–90 (Cty.Ct.N.Y.1931), the Court observed:

> "It is unquestioned that a client has the right to terminate the relationship of attorney and client at any time, with or without cause. That right is afforded him by the law because of the peculiar nature and character of the relationship, which in its very essence is one of trust and confidence. It is a right for the benefit of the client, and is intended to save him from representation by an attorney whose services he no longer desires, an obviously sound and salutary doctrine. But, while that relationship continues, it is a contract which must be respected like any other contract, and, because the law gives the client

the right to terminate the relationship at will, is no justification for maliciously inclined third persons to disrupt it while it exists."

A number of courts around the country have considered the question at issue here. As they most always do, the cases turn essentially on their facts. As a general rule, however, it seems clear that the mere negotiation and settlement of a claim by an insurance company directly with the claimant, even when the company is aware of the attorney's employment, is not enough to create liability for malicious interference with the attorney's contingent fee contract. In most of the cases finding such liability, there has been the presence of some more egregious conduct on the part of the defendant, usually in the nature of fraudulent statements made to the claimant, which induces him to dismiss the attorney and settle with the company.

In *Lurie v. New Amsterdam Casualty Co.*, 270 N.Y. 379, 1 N.E.2d 472 (1936), for example, the insurance company threatened the claimant that "unless he repudiated his retainer with plaintiff, he would receive no compensation for his injuries." *Id.*, 1 N.E.2d at 473. After the claimant dismissed his attorney, the company paid him $25,000 and took a general release. In *State Farm Mutual Ins. Co. v. St. Joseph's Hospital*, 107 Ariz. 498, 489 P.2d 837 (1971), the attorney had rejected an insurance company offer of $1400 and had yet to respond to a second offer of $1750; the company pursued the claimant and got her to agree to a settlement of $1325, knowing not only of her agreement with the lawyer but of her separate agreement to pay $392 from any recovery to her doctor; notwithstanding that "she was unaware of their significance because she was very ill at that time and in fact had to be helped out of bed by [the claims adjuster] to sign them," the company had her sign papers discharging the attorney; the adjuster thereupon escorted the claimant to the bank to cash the draft.

In *Klauder v. Cregar*, 327 Pa. 1, 192 A. 667 (1937), the adjuster initiated contact with the claimant who, on two

occasions rejected settlement proposals, telling the adjuster that she had a 50% contingent fee contract with an attorney. The adjuster informed her "that if she would settle out of court, the power of attorney she had signed with Mr. Klauder was not any good, 'That I would not have to pay him if I would settle out of court.'" That induced her to settle. In *Edwards v. Travelers Insur. of Hartford, Conn.*, 563 F.2d 105 (6th Cir.1977, applying Tennessee law), the claimant was severely injured; the company in effect conceded liability under a $50,000 policy; it knew that the claimant was represented by an attorney, but told her, falsely, that "she could not have an attorney and have her bills paid on an 'advance pay system'"; notwithstanding that the company had authorized payment of the policy limit of $50,000 and that all of the claimant's bills had not been paid, the adjuster told her that the company could go no higher than $25,000 plus the bills already paid (for a total of $35,000) and that all of her bills had been paid. Upon those knowingly false representations, the claimant discharged the attorney and ultimately settled for $35,000.

*See also Herron v. State Farm Mutual Insurance Company*, 56 Cal.2d 202, 14 Cal.Rptr. 294, 363 P.2d 310 (1961); *Employers Liability Assurance Corp. v. Freeman*, 229 F.2d 547 (10th Cir.1955); *State Farm Fire Ins. Co. v. Gregory*, 184 F.2d 447 (4th Cir.1950); *Gordon v. Mankoff*, 146 Misc. 258, 261 N.Y.S. 888 (Cty.Ct.N.Y.1931); and *cf. Fowler v. Nationwide Insurance Company*, 256 N.C. 555, 124 S.E.2d 520 (1962); *Bennett v. Sinclair Nav. Co.*, 33 F.Supp. 14 (E.D.Pa.1940); *Studdard v. Evans*, 108 Ga.App. 819, 135 S.E.2d 60 (1964).

In each of these cases, liability was predicated upon fraudulent or unconscionable conduct that actually induced the claimant to dismiss his or her attorney and settle directly with the insurer. The actionable conduct, in other words, was not the settlement itself, or even the pursuit of direct negotiations, but rather the acts or statements that induced the claimant to discharge the attorney and conclude the settlement. *Compare Keels v. Powell*, 207 S.C. 97, 34

S.E.2d 482 (1945), and *West v. Anchor Casualty Co.*, 194 Cal.App.2d 164, 14 Cal.Rptr. 791 (1961), where potential liability was found upon only general and conclusory allegations of fraudulent inducement; *but see*, by way of contrast, *Herman v. Prudence Mutual Casualty Company*, 41 Ill.2d 468, 244 N.E.2d 809 (1969); *Knell v. State Farm Mutual Automobile Ins. Co.*, 32 Ill.App.3d 491, 336 N.E.2d 568 (1975); *Volz v. Liberty Mutual Insurance Company, Inc.*, 498 F.2d 659 (5th Cir.1974); *Herbits v. Constitution Indemnity Co. of Philadelphia*, 279 Mass. 539, 181 N.E. 723 (1932); *Tauro v. General Acc. Fire & Life Assur. Corporation*, 297 Mass. 234, 8 N.E.2d 773 (1937); and *Dombey, Tyler, Richards & Grieser v. Detroit, T. & I.R. Co.*, 351 F.2d 121 (6th Cir.1965), finding no liability. In general, *see*, Annot., *Liability In Tort For Interference With Attorney-Client Or Physician-Patient Relationship*, 26 A.L.R.3d 679–706.

The requirement that there be culpable conduct apart from the mere settlement or direct negotiation is consistent with the nature of the tort. As defined in *Restatement of Torts 2d*, § 766, the tort consists of "intentionally *and improperly* interfer[ing] with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract." (Emphasis added.) Comment a to § 766 emphasizes that "for the actor to be held liable, this Section requires that his interference be improper." Not every intentional interference with a contract is actionable. Section 767 sets forth the factors to be considered in determining "whether an actor's conduct in intentionally interfering with a contract ... of another is improper":

"(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties."

Although all of these factors must be balanced, each against the others, the first of them—the nature of the actor's conduct—"is a chief factor in determining whether the conduct is improper." *Id.*, comment c. Thus,

"Under the same circumstances interference by some means is not improper while interference by other means is improper; and, likewise, the same means may be permissible under some circumstances while wrongful in others. *The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it....* Thus physical violence, fraudulent misrepresentation and threats of illegal conduct are ordinarily wrongful means and subject their user to liability *even though he is free to accomplish the same result by more suitable means.*" (Emphasis added.)

Similarly, in commenting on the fourth factor, the *Restatement* notes, in comment f,

"The correlative of the interest with which the actor interferes ... is the interest that his conduct is intended to promote. Both are important in determining whether the interference is improper. And both are to be appraised in the light of the social interests that would be advanced by their protection.

These principles were expressed as well by the Court of Appeals in *Knickerbocker Co. v. Gardiner Co.*, 107 Md. 556, 69 A. 405 (1908). In that seminal case, in which the Court first clearly adopted the rule of *Lumley v. Gye* as part of the Maryland law, it stressed that, to be actionable, the induced breach must be wrongful—without justification. At 567, 69 A. 405:

"If [a party] has the right to act, his motive in acting cannot of itself make his act wrongful, but if he had no right to procure a breach of contract *and resorts to unlawful means in doing so,* he is liable to the injured party. *We say 'unlawful means' because a party may be the means of causing a contract to be broken, and still not be liable."* (Emphasis added.)

██ Just as a claimant has a right to settle his claim with an insurer, the insurer has a right—and whenever reasonable and possible, a duty—to settle a claim made against its insured. *See State Farm v. White,* 248 Md. 324, 236 A.2d 269 (1967). Some courts have elevated that right, coupled with the claimant's right to settle, into an absolute justification for negotiating directly with a claimant in derogation of his representation by counsel, and, thus, on that basis alone, have found no improper interference with the attorney's employment contract. *See, for example, Krause v. Hartford Accident & Indemnity Co.,* 331 Mich. 19, 49 N.W.2d 41 (1951); *Herbits v. Constitution Indemnity Co. of Philadelphia, supra,* 181 N.E. 723; and *cf. Orr v. Mutual Ben. Health & Accident Ass'n,* 240 Mo.App. 236, 207 S.W.2d 511 (1947).

We do not go that far, for such a rule tends to ignore the relevance of the means used to achieve the result. We think, rather, that the insurer's right to settle is simply a factor to be taken into account in determining the propriety of its action. If, to achieve its own ends, an insurer deliberately induces the claimant to repudiate his retainer agreement by means of threats, misrepresentations, or other coercive or unconscionable conduct, its "right to settle" cannot save it from liability to the lawyer who has suffered economic detriment from the repudiation. On the other hand, subject to other constraints not apparent from the record before us,[3] if a claimant indicates a willingness to

---

**3.** In *Herron v. State Farm Mutual Insurance Company, supra,* 56 Cal.2d 202, 14 Cal.Rptr. 294, 295, 363 P.2d 310, 311, reference is made to rules of the National Conference Committee on Adjusters providing

settle without the intervention of his lawyer and the insurer simply responds to that and proceeds in good faith to settle the claim without engaging in any of the opprobrious conduct noted above, we do not think it has improperly interfered with the lawyer's retention agreement.

■ Viewing the allegations in Sharrow's complaint in the light of these principles, it is clear that the circuit court was correct in its judgment. It is apparent from the two paragraphs 12 that Zorbach approached State Farm against Sharrow's advice and reached agreement on a $2,500 settlement without any blandishments or improper inducements on the part of the insurer. The allegedly false statement required by State Farm (1) came *after* the parties had already made their agreement to settle, and (2) was not entirely false. The first statement—the certificate that Zorbach had discharged Sharrow—became true the instant it was signed. Sharrow conceded as much at oral argument. What was, allegedly, false, then, was merely the further certification that "I have advised Ronald Sharrow of my intention to settle my injury claim directly...." But even if we accept the averments that that statement was false and that State Farm knew it was false, there is still no allegation that it had anything to do with inducing Zorbach to abrogate his agreement with Sharrow. In short, none of the bases of liability set forth in paragraph 14 of the complaint suffice, in law, to create such liability.

Counts II and III are no better. It is apparent from paragraph 18 that Burns's alleged statement that "since it was Zorbach, not Sharrow, *that settled the claim,* Sharrow should not receive a fee for legal services" (emphasis added) came *after* the settlement was agreed upon and could not, therefore, have been an inducement to repudiate the agree-

---

that "an insurance company will not deal directly with any claimant represented by an attorney without the consent of the attorney...." Whether such rules still exist or continue to bind State Farm is not revealed in the record before us. The plaintiff in *Herron* averred the violation of those rules as evidence of the insurer's malice; no such allegation appears here.

ment with Sharrow. Accordingly, Rinehardt's refusal to disavow Burns's actions and to pay a fee to Sharrow cannot be regarded as constituting an improper interference with Sharrow's contract.

In closing, we desire to make clear that we are dealing only with the complaint before us. We do not necessarily condone insurance companies dealing with claimants whom they know are represented by counsel and, indeed, we especially warn them that, if in the course of any such negotiations they do or say anything inappropriate to induce the claimant to shed his lawyer, they may well incur liability.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.