511 A.2d 492

**RONALD M. SHARROW, CHARTERED**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et al.**

No. 111, Sept. Term, 1985.

Court of Appeals of Maryland.

July 15, 1986.

David Freishtat (W. Michael Mullen and Freishtat & Sandler, on brief), Baltimore, for appellant.

Michael J. Budow (Richard E. Schimel and Budow & Noble, P.C., on brief), Bethesda, for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and McAULIFFE, JJ. and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

MURPHY, Chief Judge.

This case involves allegations by an attorney that an insurance carrier has tortiously interfered with his contingent fee contract by settling a personal injury claim directly with the attorney's client. Determinative of the issue before us is the nature of the insurer's conduct that must be alleged in order for such a claim to be actionable and whether the allegations of fact in the attorney's complaint "state a claim upon which relief can be granted." Md. Rule 2–322(b)(2).

## I.

On December 24, 1983, Donald P. Zorbach was involved in an accident with an automobile insured by State Farm. Zorbach retained Ronald M. Sharrow, an attorney, for the purpose of pursuing a claim relating to personal injuries sustained in that accident. In a written agreement dated December 29, 1983, Sharrow agreed to represent Zorbach for a fee of one-third of any recovery obtained through settlement or 40% if suit was filed.

On March 16, 1984, Sharrow filed a three count complaint in the Circuit Court for Baltimore City against State Farm and two of its employees, Mary A. Burns and William Rinehardt, alleging that they tortiously interfered with his contingent fee contract by negotiating and settling the claim directly with Zorbach. Count I of the complaint, entitled "Intentional Interference with Contract Rights—

State Farm," alleges the existence of the contingent fee contract; that Sharrow wrote Burns on January 4, 1984, advising State Farm of his representation of Zorbach; that State Farm, through Burns, acknowledged Sharrow's representation and mailed the appropriate claim form to him for completion by Zorbach; that Sharrow forwarded a completed "State Farm Insurance Company Personal Injury Protection Form" to the insurer which subsequently forwarded to Sharrow confirmation of payments which it made to various medical providers on Zorbach's behalf. The complaint then alleges:

"11. On or about February 20, 1984, Zorbach advised Sharrow he was in desperate financial condition and requested that Sharrow lend him money. Sharrow declined and advised Zorbach that it is unethical for an attorney to make a loan to a client. Zorbach was further advised that it was not the practice of an insurance carrier to advance money against a settlement and it would be unwise to approach State Farm with such a request.

12. Due to his dire financial condition, Zorbach, on or about February 21, 1984, contached State Farm and requested an advance. Zorbach acted without Sharrow's knowledge or acquiescence and contrary to Sharrow's advice. State Farm, through its agents, servants and employees, denied Zorbach's request and instead negotiated a settlement of Zorbach's claim for $2,500.00. Zorbach was directed to go to the Harford Road office to execute certain documents to finalize the settlement.

12. [*sic*] Zorbach went to State Farm's offices as directed and executed a release. Zorbach was also required by State Farm's agents, servants and employees to execute a document discharging Sharrow as his attorney and stating that he had advised Sharrow of his intention to settle directly with State Farm. This written statement was false and was known by State Farm to be false. (See Exhibit 7 attached hereto.)[1]

---

**1.** Exhibit 7 reads as follows:

13. State Farm through its agents, servants and employees, was aware of the existence of a contractual agreement between Sharrow and Zorbach and had full knowledge that the contractual agreement was in existence at the time of the settlement negotiations with Zorbach.

14. State Farm, through its agents, servants and employees, intentionally, willfully and maliciously interfered with Sharrow's contractual rights by negotiating with Zorbach while he was still represented by Sharrow, by causing Zorbach to terminate Sharrow's representation without Sharrow's knowledge, and by requiring that Zorbach falsely state, in writing, that he had advised Sharrow of his intention to deal directly with State Farm.

15. State Farm's actions in interfering with Sharrow's contract rights were perpetrated solely to injure Sharrow and wrongfully deprive it of the benefit of its contract with Zorbach."

Count II, entitled "Intentional Interference with Contract Rights—Mary A. Burns," reasserts the same allegations and adds that Burns was the claim adjuster assigned to

---

"I DONALD ZORBACH, hereby certify that I have discharged Ronald Sharrow as my attorney relative to his representation for an automobile accident which I was involved in on 12/24/83 while a passenger in the vehicle operated by Gilbert Merson.

I further certify that I have advised Ronald Sharrow of my intention to settle my injury claim directly with State Farm Insurance Company.

DATED: _____ (SEAL) _____
                                    DONALD ZORBACH

It is further understood that my signing of the Release forever discharges Gilbert E. Merson, his heirs, executors, administrators, agents and assigns, and all other persons, firms or corporations liable or who might be claimed to be liable, none of whom admit any liability to the undersigned.

I also understand that any additional medical expenses will be paid under the No-Fault provisions of the Merson policy, which are accident related, the statute in the State of Maryland being 3 years from the date of loss.

                                    (SEAL) _____
WITNESS: _____ "

Zorbach's claim; that she had full knowledge of the existence of Sharrow's contract with Zorbach; that she acted within the scope of her employment and that she

"18. ... intentionally, willfully and maliciously interfered with Sharrow's contract rights by negotiating with Zorbach while he was still represented by Sharrow, by causing Zorbach to terminate Sharrow's representation without Sharrow's knowledge, and by requiring that Zorbach falsely state in writing that he had advised Sharrow of his intention to deal directly with State Farm. Burns further interfered with Sharrow's contract rights by stating to Zorbach that since it was Zorbach, not Sharrow, that settled the claim, Sharrow should not receive a fee for legal services."

Sharrow further alleged that Burns' actions were undertaken solely to injure and wrongfully deprive him of the benefit of his contract.

Count III, entitled "Intentional Interference with Contract Rights—William Rinehardt," adopts the allegations of the prior two counts and focuses on Rinehardt's claimed tortious conduct. The count alleges that Rinehardt was acting within the scope of his employment as Burns' supervisor and had full knowledge of Sharrow's contract with Zorbach. It states:

"22. Subsequent to learning of the settlement with Zorbach, Sharrow contacted Rinehardt by telephone to discuss Burns' conduct and to demand that a fee be paid to Sharrow. Rinehardt refused to discuss the matter and abruptly terminated that conversation.

23. Rinehardt was aware of the acts perpetrated by Burns and participated with Burns in maliciously interfering with Sharrow's contract rights.

24. Rinehardt failed to take appropriate action to correct the conduct of Burns despite being specifically informed of her conduct by Sharrow and further refused to honor Sharrow's demand that a fee be paid in accordance with the contractual agreement with Zorbach.

25. Rinehardt intentionally, willfully and maliciously interfered with Sharrow's contract rights by participating in, and refusing to correct, the acts of Burns and by refusing to honor Sharrow's claim to a fee."

It is further alleged that Rinehardt acted solely to injure and deprive Sharrow of the benefit of his contingent fee contract. With respect to all three counts, Sharrow alleged that as a direct and proximate result of the conduct of State Farm, Burns and Rinehardt, he was damaged; he claimed $50,000 compensatory and $1,000,000 in punitive damages.

State Farm demurred to Sharrow's complaint. Treating the demurrer as a motion to dismiss under Md. Rules 2–302 and 2–322(b), the trial court dismissed the complaint and Sharrow appealed. The Court of Special Appeals affirmed the judgment in *Sharrow v. State Farm Mutual*, 63 Md. App. 412, 492 A.2d 977 (1985).

The intermediate appellate court held that an action for tortious interference with contractual relations is applicable to professional service contracts between attorneys and clients. In considering whether particular conduct by a third party is actionable, the court recognized that an attorney has a legitimate interest in a contingent fee contract. The court also recognized the good faith right of the client to settle his cause of action without the attorney's knowledge or consent. And, moreover, it observed that an insurance company "has a right—and whenever reasonable and possible, a duty—to settle a claim made against its insured." 63 Md.App. at 424, 492 A.2d 977. But nothing in these respective rights and interests, the court said, constitutes justification for a third party to maliciously interfere with an attorney-client contract while it is in existence. Citing cases from other jurisdictions, the court, speaking through Judge Wilner, said that as a general rule

"the mere negotiation and settlement of a claim by an insurance company directly with the claimant, even when the company is aware of the attorney's employment, is not enough to create liability for malicious interference with the attorney's contingent fee contract. In most of

the cases finding such liability, there has been the presence of some more egregious conduct on the part of the defendant, usually in the nature of fraudulent statements made to the claimant, which induces him to dismiss the attorney and settle with the company." *Id.* at 420, 492 A.2d 977.

The court noted that the cases supporting this view have predicated liability "upon fraudulent or unconscionable conduct that actually induced the claimant to dismiss his or her attorney and settle directly with the insurer." *Id.* at 421, 492 A.2d 977. The actionable conduct, according to the intermediate appellate court, "was not the settlement itself, or even the pursuit of direct negotiations, but rather the acts or statements that induced the claimant to discharge the attorney and conclude the settlement." *Id.* That there be "culpable conduct" apart from the mere settlement or direct negotiation between the client and the insurer was said to be consistent with the nature of the tort. *Id.* at 422, 492 A.2d 977.

The court found additional support for its analysis in Restatement (Second) of Torts § 766 (1977), which states that the tort consists of "intentionally and improperly interfer[ing] with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract." The court emphasized that under Comment a to this section, the interference, to be actionable, must be "improper"; and that under § 767 a "chief" factor, to be balanced with other factors there specified, in deciding whether an actor's conduct is improper is the nature of the conduct, *e.g.*, that "physical violence, fraudulent misrepresentation and threats of illegal conduct are ordinarily wrongful means" and thus actionable. The court thereafter concluded that an insurer's conduct in settling a claim directly with a client known to be represented by counsel is actionable in these circumstances: "If, to achieve its own ends, an insurer deliberately induces the claimant to repudiate his retainer agreement by means of threats, misrepresentations, or oth-

er coercive or unconscionable conduct, its 'right to settle' cannot save it from liability to the lawyer who has suffered economic detriment from the repudiation." *Id.* at 424, 492 A.2d 977. On the other hand, the court said that if a claimant indicates that he is willing to settle without the intervention of his lawyer and the insurer "simply responds to that and proceeds in good faith to settle the claim without engaging in any of the opprobrious conduct noted above," the insurer's conduct is not improper and is therefore not actionable. *Id.* at 424, 492 A.2d 977.

Applying these principles, the court then undertook to determine "whether, assuming the truth of all wellpleaded allegations of fact, appellant's complaint 'state[s] a claim upon which relief can be granted.' Md. Rules 2–322(b)(2)." 63 Md.App. at 413, 492 A.2d 977. In affirming the trial court's judgment that Sharrow's allegations provided no basis for liability, the court noted, as to Count I, that Zorbach approached State Farm and reached a settlement agreement without "blandishments or improper inducements" on State Farm's part. *Id.* at 425, 492 A.2d 977. Furthermore, said the court, "[t]he allegedly false statement required by State Farm [as to Zorbach having advised Sharrow of his intention to settle directly with State Farm and that he had discharged Sharrow] (1) came *after* the parties had already made their agreement to settle, and (2) was not entirely false" in that the statement that Sharrow had been discharged became true the instant the document was signed. *Id.* at 425, 492 A.2d 977 (emphasis in original). The allegations of Counts II and III were also found to be insufficient. Burns' alleged statement that Zorbach did not have to pay Sharrow was construed as having been made only after a settlement was concluded and could not, therefore, have served to induce Zorbach to repudiate his agreement with Sharrow. Since Burns did nothing improper, the court reasoned that Rinehardt did nothing improper in refusing to disavow Burns' actions and to pay Sharrow. *Id.* at 425–26, 492 A.2d 977.

We granted Sharrow's petition for certiorari to determine whether the allegations of his complaint were sufficient to state a cause of action and thus preclude the granting of a motion to dismiss.

## II.

Intentional or malicious interference with contract is a well-established tort in Maryland. *See, e.g., Vane v. Nocella,* 303 Md. 362, 494 A.2d 181 (1985); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 485 A.2d 663 (1984); *Rite Aid Corp. v. Lake Shore Inv.,* 298 Md. 611, 471 A.2d 735 (1984); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 424 A.2d 744 (1981); *Stannard v. McCool,* 198 Md. 609, 84 A.2d 862 (1951); *Goldman v. Building Assn.,* 150 Md. 677, 133 A. 843 (1926); *Cumberland Glass Mnf'g Co. v. DeWitt,* 120 Md. 381, 87 A. 927 (1913), *aff'd,* 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 69 A. 405 (1887); *Gore v. Condon,* 87 Md. 368, 39 A. 1042 (1898). As we said in *Natural Design, supra,* 302 Md. at 69, 485 A.2d 663, the tort may arise where intentional interference by a third party with another in his business or occupation induces a breach of an existing contract or where, absent a breach of contract, there is malicious or wrongful interference with an economic relationship. *See also Lake Shore Investors v. Rite Aid Corp.,* 67 Md.App. 743, 509 A.2d 727 (1986).

The 1887 case of *Knickerbocker Co. v. Gardiner Co., supra,* is a leading authority in Maryland on the tort of intentional or malicious interference with contract. There, a dairy and the Sumwalt Ice and Coal Company entered into a contract whereby Sumwalt agreed to supply ice to the dairy. Sumwalt, however, was forced by the exigencies of its business to purchase ice from the Knickerbocker Ice Co. which threatened to cease supplying ice to Sumwalt if it continued to supply the dairy. The dairy was then forced to purchase ice from Knickerbocker at a greater price and

sued Knickerbocker, alleging interference with its contract with Sumwalt. Relying largely on *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng. Rep. 749 (1853), Chief Judge Boyd noted for the court that the relevant authorities sustained the right to maintain a tort action upon the doctrine that a person who induces one of two parties to a contract to break it, intending thereby to injure the other, or to obtain a benefit for himself, does the other an actionable wrong. *Id.* at 564, 69 A. 405. The court said:

"It cannot be denied that it is unlawful for a party to a contract to break it, unless, of course, he has sufficient ground for doing so, and therefore when a third party procures or induces him to do so, he is causing him to do an unlawful act, which is itself unlawful, and the law ought to afford a remedy to the injured party." *Id.*

*Knickerbocker* pointed out, however, that a party may be the means of causing a contract to be broken and still not be liable. *Id.* at 567, 69 A. 405. Quoting from *Bowan v. Hall*, 6 Q.B.D. 333, 338 (1881), the court observed:

" 'Merely to persuade a person to break his contract may not be wrongful in law or fact.... But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it.' " *Id.* at 565, 69 A. 405.

*Knickerbocker* explained that it was not necessary to prove express malice but only that the interference was wrongful and without justification. *Id.* at 568, 69 A. 405. As the later cases also make clear, malice in this form of action means legal malice, not ill will or spite, and need be only a wrongful or unlawful act done intentionally without cause or excuse. *Natural Design, supra,* 302 Md. at 71, 485 A.2d 663; *Stannard, supra,* 198 Md. at 617, 84 A.2d 862; *Cumberland Glass, supra,* 120 Md. at 392–93, 87 A. 927; *see*

*also* Harper and James, *Torts,* ch. VI § 6.6 (1956); Prosser and Keeton, *Torts,* ch. 24, § 129 (5th ed. 1984).

It is thus clear from our cases that even though a third party may for his own benefit intentionally induce one party to terminate a contract with another, this alone will not render him liable in an action for tortious interference if he had a right to cause the breach since, in such circumstances, the conduct would not be wrongful or improper. *Stannard, supra,* 198 Md. at 616, 84 A.2d 862; *Cumberland Glass, supra,* 120 Md. at 394, 87 A. 927; *Knickerbocker, supra,* 107 Md. at 566–67, 69 A. 405; Harper and James, *supra,* § 6.6; Prosser and Keeton, *supra,* § 129. But if the party causing the breach acts solely to benefit himself, or to cause injury to another, without a right to so act, such conduct is improper and may subject the party to liability for the injury suffered. *Knickerbocker, supra.*

### III.

We agree with the Court of Special Appeals and the great majority of other jurisdictions that have considered the matter, that contracts between attorneys and clients, like other business contracts, are protected from tortious interference by third parties. *See* Annot. *Liability in Tort for Interference with Attorney-Client or Physician-Patient Relationship,* 26 A.L.R.3d 679 (1969) and cases cited therein. As stated by the intermediate appellate court in this case:

"[W]e see no reason why attorney-client agreements should be regarded as pariahs in the eyes of the law— why they, like most all other contracts, should not be protected against tortious interference by third parties. Whether viewed from the perspective of the lawyer or the client, it is not against public policy to preclude outsiders from improperly inducing either one to repudiate a valid

contract he has made with the other; indeed, it would be contrary to public policy not to preclude such interference." [2]  63 Md.App. at 418, 492 A.2d 977.

It is true, of course, that notwithstanding the existence of a contingent fee contract, the client may, in good faith, compromise, settle, or dismiss his cause of action without the attorney's intervention, knowledge, or consent. *Maddox v. District Supply, Inc.*, 222 Md. 31, 158 A.2d 650 (1960); *Palmer v. Brown*, 184 Md. 309, 40 A.2d 514 (1945); *Boyd v. Johnson*, 145 Md. 385, 125 A. 697 (1924). It is also true that an insurer has a right and duty to enter into good faith negotiations, where reasonable and feasible, to settle a claim against its insured within policy limits. *State Farm v. White*, 248 Md. 324, 236 A.2d 269 (1967). But the insurer's duty in this regard does not afford it a right to interfere with the lawyer's legitimate interest in a contingent fee contract, while it exists, by improperly engaging in conduct calculated to induce or persuade the client to discharge the lawyer and settle his claim directly with the insurer.

In its opinion, the Court of Special Appeals indicated that the conduct of the interfering third party, to be actionable, must be either egregious, opprobrious, fraudulent, coercive, or unconscionable and manifested by threats, misrepresentations, or other acts or statements made for the purpose of inducing the client to repudiate the contract and settle directly with the insurer. We think this standard is too restrictive and that the better rule would define as

---

**2.** The question whether an action for tortious interference with contractual relations is applicable to professional service contracts between attorneys and clients was before the Court, but not decided, in *Ensor v. Bolgiano*, 67 Md. 190, 9 A. 529 (1887). Only a few courts, however, have found the doctrine of tortious interference with contract not applicable to attorney-client contracts. *See Walsh v. O'Neill*, 350 Mass. 586, 215 N.E.2d 915 (1966); *Orr v. Mutual Ben. Health & Accident Ass'n*, 240 Mo.App. 236, 207 S.W.2d 511 (1947).

actionable any purposeful conduct, however subtle, by which an insurer improperly and intentionally induces or persuades a client to discharge his counsel and settle directly with it.[3]

Consistent with this broader rule, a number of cases which have considered the tort of intentional interference with a contract between an attorney and his client have concluded, in effect, that to be actionable the conduct of the insurer need not necessarily be egregious in nature but only intentional for the improper purpose of inducing the client to repudiate his contract and settle directly with the insurer. *See, e.g., Edwards v. Travelers Insur. of Hartford, Conn.,* 563 F.2d 105 (6th Cir.1977) (interpreting Tennessee law); *Employers Liability Assurance Corp. v. Freeman,* 229 F.2d 547 (10th Cir.1955) (interpreting Oklahoma law); *State Farm Fire Ins. v. Gregory,* 184 F.2d 447 (4th Cir.1950) (interpreting South Carolina law); *Bennett v. Sinclair Nav. Co.,* 33 F. Supp. 14 (E.D. Penn. 1940); *State Farm Mutual Ins. Co. v. St. Joseph's Hospital,* 107 Ariz. 498, 489 P.2d

---

**3.** Comment k to § 766 of the Restatement notes as follows:

"There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. The interference is often by inducement. The inducement may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other. Thus it may be a simple request or persuasion exerting only moral pressure. Or it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made. Or it may be a threat by the actor of physical or economic harm to the third person or to persons in whose welfare he is interested. Or it may be the promise of a benefit to the third person if he will refrain from dealing with the other.

"On the other hand, it is not necessary to show that the third party was induced to break the contract. Interference with the third party's performance may be by prevention of the performance, as by physical force, by depriving him of the means of performance or by misdirecting the performance, as by giving him the wrong orders or information."

Comments 1 and m to § 766 set forth other means of interference, *i.e.,* inducement by refusal to deal and inducement by an offer of better terms.

837 (1971); *Weiss v. Marcus,* 51 Cal. App. 3d 590, 124 Cal.Rptr. 297 (1975); *Herron v. State Farm Mutual Insurance Company,* 56 Cal.2d 202, 14 Cal.Rptr. 294, 363 P.2d 310 (1961); *Lurie v. New Amsterdam Casualty,* 270 N.Y. 379, 1 N.E.2d 472 (1936); *Ross v. Woyan,* 1 Ohio App. 3d 39, 439 N.E.2d 428 (1980); *Keels v. Powell,* 207 S. C. 97, 34 S.E.2d 482 (1945).[4] The pivotal issue in such cases is whether it was the purposeful conduct of the insurer, or of the client, that resulted in the discharge of the attorney and the direct settlement between the client and the insurer.

## IV.

Under Md. Rule 2–322, a motion to dismiss for failure to state a claim serves the same function as the demurrer under former Rules 345 and 371 b. *Broadwater v. State,* 303 Md. 461, 494 A.2d 934 (1985); P. Niemeyer and L. Richards, *Maryland Rules Commentary,* at 149 (1984). Consequently, in considering the legal sufficiency of Sharrow's complaint to allege a cause of action for tortious interference, we must assume the truth of all relevant and material facts that are well pleaded and all inferences which can be reasonably drawn from those pleadings. *Tadjer v. Montgomery County,* 300 Md. 539, 542, 479 A.2d 1321 (1984); *Hoffman v. Key Fed. Sav. & Loan,* 286 Md. 28, 416 A.2d 1265 (1979). On the other hand, any ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader. *Continental Masonry v. Verdel Constr.,* 279

---

**4.** Some courts seem to require that the conduct of the insurer, to be actionable, must be egregious in nature. *See Volz v. Liberty Mutual Insurance Company, Inc.,* 498 F.2d 659 (5th Cir.1974) (interpreting Alabama law); *Herman v. Prudence Mutual Casualty Company,* 41 Ill. 2d 468, 244 N.E.2d 809 (1969); *Krause v. Hartford Accident & Indemnity Co.,* 331 Mich. 19, 49 N.W.2d 41 (1951). The rule in these cases would appear to leave inactionable more subtle and sophisticated means of improperly inducing or persuading a client to discharge the lawyer and conclude a settlement directly with the insurer.

Md. 476, 369 A.2d 566 (1977); *Read Drug v. Colwill Constr.*, 250 Md. 406, 243 A.2d 548 (1968); *Carder v. Steiner*, 225 Md. 271, 170 A.2d 220 (1961).

█ Sharrow contends that he adequately stated a cause of action for tortious contract interference by alleging facts which, together with inferences properly to be drawn therefrom, averred that State Farm, knowing of Sharrow's representation of Zorbach, sensed Zorbach's desperate need for money when he contacted the insurer for an "advance" on his pending claim; that the insurer "seized the opportunity to exploit Zorbach's financial plight and induced a settlement"; and that "the egregious nature of State Farm's conduct was compounded by its requirement that Zorbach execute documents it prepared which falsely stated that he had terminated Sharrow as his attorney and had advised Sharrow that he intended to deal directly with State Farm." Sharrow claims that this conduct was coercive and malicious; that Zorbach did not voluntarily and freely terminate his contract, but was induced to do so by State Farm's "opprobrious" conduct and misrepresentations. Sharrow contends that the allegations of the complaint must be read as a whole and collectively viewed as a connected series of events which involved false documents and which ultimately served to induce and facilitate the settlement. Sharrow also suggests that a reasonable inference to be drawn from the facts alleged in his complaint is that the conversations between State Farm's agents and Zorbach were calculated to induce Zorbach's full and final acceptance of the settlement terms and to dispel any doubt he may have had regarding his potential liability to his attorney.

Absent from Sharrow's complaint is a specific averment that it was State Farm, rather than Zorbach, who actually initiated the settlement negotiations. Nor is there any allegation in the complaint that State Farm's purpose in negotiating directly with Zorbach was for its own benefit;

indeed, the only allegation in the complaint is that State Farm's actions and those of its agents were solely to injure Sharrow and wrongfully deprive him of the benefit of his contract with Zorbach. Notwithstanding these shortcomings, we think that the allegations, and reasonable inferences therefrom, state a claim sufficient to withstand a dismissal of the complaint under Md. Rule 2–322. With due deference to the rule that ambiguities and uncertainties in a pleading are to be construed against the pleader, the allegations of the complaint, taken collectively, can by a thin hair be read to aver as follows: that State Farm capitalized on Zorbach's need for money by first denying the requested "advance" and thereafter by directly implicating him in settlement negotiations which it programmed to require, as a settlement condition precedent, that Zorbach avow in writing, falsely, that he had earlier advised Sharrow of his intention to settle directly with State Farm and had discharged Sharrow as his attorney—all for the purpose of inducing Zorbach to repudiate his contract with Sharrow and thus enable State Farm to deprive Sharrow of his fee under the contract.

There is, of course, a big difference between that which is necessary to prove the commission of the tort and that which is necessary merely to allege its commission. We think, therefore, in the circumstances that all three counts of the complaint, although lacking in desired specificity, are barely adequate to allege a claim for tortious interference with contract.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH DIRECTIONS THAT THE ORDER DISMISSING THE COMPLAINT BE VACATED AND THE CASE SCHEDULED FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY THE APPELLEE.